CASE NO. 3:21-cv-04597-WHO

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

In re EVANDER FRANK KANE,

*Debtor*,

CENTENNIAL BANK,
an Arkansas state chartered bank,

*Appellant,*

vs.

EVANDER FRANK KANE

*Appellee.*

On Appeal From The United States Bankruptcy District Court
Case No. 21-50028-SLJ
Honorable Stephen L. Johnson

**APPELLANT CENTENNIAL BANK'S OPENING BRIEF**

John A. Anthony, FL Bar No: 0731013
Andrew Ghekas, FL Bar No: 119169
ANTHONY & PARTNERS, LLC
100 S. Ashley Drive, Suite 1600
Tampa, Florida  33602
Tel: 813-273-5616
janthony@anthonyandpartners.com
aghekas@anthonyandpartners.com

Peter C. Califano, SBN 129043
COOPER, WHITE & COOPER LLP
201 California Street, 17th Floor
San Francisco, California 94111
Telephone:  415.433.1900
pcalifano@cwclaw.com

*Attorneys for CENTENNIAL BANK*

## <u>CERTIFICATION OF CORPORATE DISCLOSURE STATEMENT</u>

I certify that Centennial Bank, N.A. ("Centennial"), is a wholly owned subsidiary of Home BancShares, Inc. ("HOMB"), a bank holding company which is itself a publicly traded company trading as "HOMB" on the NASDAQ Global Select Market.  HOMB has no parent corporation and no publicly-held corporation owns 10% or more of HOMB's stock other than BlackRock Inc., which owns 10.84% of HOMB's stock.  There are no other interested entities or persons other than HOMB to report.

DATED:  September 21, 2021          ANTHONY & PARTNERS, LLC


By:   <u>   /s/ John A. Anthony                    </u>
        John A. Anthony
        Attorneys for CENTENNIAL BANK



DATED:  September 21, 2021          COOPER, WHITE & COOPER LLP


By:   <u>   /s/ Peter C. Califano                   </u>
        Peter C. Califano
        Attorneys for CENTENNIAL BANK

# **TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................1

II.  JURISDICTIONAL STATEMENT ..................................2

III. STATEMENTS OF ISSUES ON ...................................4

APPEAL AND STANDARDS OF REVIEW ......................4

   A.  Statement of the Standard of Review ........................4

   B.  Centennial's Statement of Issues Presented on Appeal .................5

IV.  STATEMENT OF THE CASE AND RELEVANT FACTUAL
     BACKGROUND .........................................................6

V.   SUMMARY OF ARGUMENT ....................................13

VI.  ARGUMENT ............................................................14

   A.  The Debtor's Stated Purpose in Incurring the Centennial Debt .................15

   B.  The Debtor's Total Debt Obligation Does Not Constitute Primarily Business
      Debt As The Debtor Falsely Claimed ..............................19

   C.  The Bankruptcy Court's Manufacturing of a "Gray Area" ...........................21

   D.  In Ignoring the Debtor's Purpose in Acquiring the Centennial Debt, the
      Bankruptcy Court Has Created an Unestablished Alternative Purpose .........24

   E.  The Debtor's Total Debt Obligation Is Primarily Consumer Debt, Not
      Business Debt and Not Non-Consumer Debt .................................29

   F.  The Bankruptcy Court Placed an Improper Burden on Centennial and
      Excused the Debtor's Own Ignorance ............................................31

VII. CONCLUSION ..........................................................34

CERTIFICATE OF COMPLIANCE .......................................37

# TABLE OF AUTHORITIES

## Cases

Alexander v. Compton (In re Bonham)
   229 F.3d 750 (9th Cir. 2000) ...................................................................................3

Alvarez Velez
   617 B.R. 158 (1st Cir. BAP 2020)..........................................................................17

In re Booth
   858 F.2d 1051 (5th Cir. 1988) ................................................................................15

In re Cherrett
   523 B.R. 660 (9th Cir. BAP 2014) ................................................................. passim

In re Cherrett
   873 F.3d 1060 (9th Cir. 2017) ............................................................. 4, 14, 28, 29

In re Durant
   586 B.R. 212 (Bankr. D. Md. 2018) .......................................................................17

In re Ferreira
   549 B.R. 232 (Bankr. E.D. Cal. 2016)....................................................................31

In re Frontier Properties, Inc.
   979 F.2d 1358 (9th Cir. 1992) ..................................................................................3

In re Garcia
   606 B.R. 98 (Bankr. D.N.M. 2019) ......................................................... 21, 22, 23

In re Greene
   157 B.R. 496 (Bankr. S.D. Ga. 1993)......................................................................18

In re Grillot
   2017 WL 4286882 (Bankr. D. Kan. Sept. 22, 2017)............................................17

iii

In re Grillot
   578 B.R. 651 (Bankr. D. Kan. 2017) ....................................................................23

In re Hickman
   384 B.R. 832 (9th Cir. BAP 2008) ........................................................................3

In re Hill
   268 B.R. 548 (9th Cir. BAP 2001) ......................................................................19

In re Joseph
   208 B.R. 55 (9th Cir. BAP 1997) ..........................................................................4

In re Kelly
   841 F.2d 908 (9th Cir. 1988) ........................................................................ 19, 24

In re Kersten
   No.: 17-13739-7, 2018 WL 2413829 (Bankr. W.D. Wis. May 25, 2018) .... 14, 15

In re Liegey
   No.: 1:09-bk-00661MDF, 2009 WL 3817902
   (Bankr. M.D. Penn. Nov. 13, 2009)............................................................... 25, 32

In re Marshalek
   158 B.R. 704 (Bankr. N.D. Ohio 1993).................................................... 15, 17, 18

In re Martin
   2013 WL 5423954 (Bankr. S.D. Tx. Sep. 26, 2013)...........................................24

In re Montalto
   537 B.R. 147 (Bankr. E.D.N.Y. 2015) .................................................................31

In re Peterson
   524 B.R. 808 (Bankr. S.D. Ind. 2015) .................................................................18

In re Price
    353 F.3d 1135 (9th Cir. 2004) ...........................................................4, 34

In re Scurlock
    385 B.R. 814 (Bankr. M.D.N.C. 2009)................................................31

In re Searles
    317 B.R. 368 (9th Cir. BAP 2004) .......................................................5

In re Steiner
    2020 WL 2027250 (Bankr. S.D. Ill. Jan. 29, 2020).............................14

In re Stewart
    201 B.R. 1002 (Bankr. N.D. Okla. 1996) ............................................14

In re Stovall
    209 B.R. 849 (Bankr. E.D. Va. 1997)..................................................17

In re Straughter
    219 B.R. 672 (Bankr. E.D. Penn. 1998) ..............................................23

In re Strausbaugh
    376 B.R. 631 (Bankr. S.D. Ohio 2007)................................................16

In re Terzo
    502 B.R. 553 (Bankr. N.D. Ill. 2013) ..................................................15

In re White
    49 B.R. 869 (Bankr. W.D. N.C. 1985) ......................................... 17, 18

In re Whitelock
    122 B.R. 582 (Bankr. D. Utah 1990)........................................... 25, 26

In re Zgonina,
    No.: 19-90467, 2019 WL 6170776 (Bankr. C.D. Ill. Nov. 19, 2019) ....................18

IRS v. Westberry (In re Westberry)

215 F.3d 589 (6th Cir. 2000) ....................................................... 15, 18

McDow v. Dudley
   662 F.3d 284 (4th Cir. 2011) ...................................................4

McDow v. Meade (In re Meade)
   420 B.R. 291 (Bankr. W.D. Va. 2009) ...................................31

Riviere, et al. v. Banner Chevrolet, Inc. et al.
   184 F.3d 457 (5th Cir. 1999) .................................................24

United States v. Hinkson
   585 F.3d 1247 (9th Cir. 2009) ...............................................5

**Statutes**
11 U.S.C. § 101(8) .................................................. 8, 13, 14
11 U.S.C. § 707(b) .................................................. 4, 13, 35
11 U.S.C. § 707(b)(1) ...................................................14
11 U.S.C. § 707(b)(2)(A) ...............................................34
28 U.S.C. § 158(a)(1) ....................................................4

**Rules**

Fed. R. Bankr. P. 8002(a)(1) ...........................................3
Fed. R. Bankr. P. 8015(a) .............................................37
Fed. R. Bankr. P. 8015(g) .............................................37

# I.  <u>INTRODUCTION</u>

This appeal arises from the denial of a motion to dismiss the Chapter 7[1] bankruptcy case (the "Bankruptcy Case") of debtor Evander Frank Kane (the "Debtor") for abuse based on his ability to pay all of his debts substantially in full from his income derived as a professional ice hockey player that is expected to amount to upwards of $26,000,000 over the next four (4) years.

Centennial's motion (the "Dismissal Motion") [CB137-156] contended that the Debtor's debts were "primarily consumer debt" as required for the application of Section 707(b)(1) because sixty-eight (68%) percent of the Debtor's scheduled liabilities were voluntarily incurred to pay down or off personal obligations of the Debtor or to meet other personal, household, and financial obligations.  As defined by Section 101(8), "[t]he term 'consumer debt' means debt incurred by an individual primarily for a personal, family, or household purpose."

However, the Debtor contended in his response (the "Dismissal Response") [CB225-241] that the debt incurred from Centennial – as well as the other identified "Lenders" - was primarily incurred for unspecified non-consumer purposes.  The Debtor argued little more than "[t]he idea that close to $15 million of loans arranged by a specialized underwriter/broker, all allegedly secured by complicated and

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

1

questionable transaction documents, should be considered consumer debt, is simply not credible." [CB229].

On June 1, 2021, the Honorable Stephen L Johnson of the United States Bankruptcy Court for the Northern District of California, San Jose Division (the "Bankruptcy Court") found that the debt owed to Centennial and the other Lenders were not consumer debts. [CB411-426]. Based thereon, the Bankruptcy Court found that the Debtor's debts were not primarily "consumer debts" as required for the application of Section 707(b)(1), and, on that basis, the Bankruptcy Court denied the Dismissal Motion.

Centennial respectfully requests that this Court reverse the denial of the motion to dismiss and remand this matter for a determination of whether this case constitutes an abuse under Section 707(b)(1) and (3). To find that debt incurred of one's own volition for the sole purpose of managing the borrower's personal financial difficulties is somehow non-consumer for reasons that ignore the borrower's stated purpose runs afoul of the Bankruptcy Code and Ninth Circuit precedent.

## II.  <u>JURISDICTIONAL STATEMENT</u>

On June 1, 2021, the Bankruptcy Court entered the "Amended Order Denying Motion to Dismiss" [CB411-426], and thereby amended its initial "Order Denying Motion to Dismiss" [CB395-410], entered on May 18, 2021, both of which are

together referred to herein as the "Dismissal Order."  On June 8, 2021, Centennial filed its "Notice of Appeal and Statement of Election to Have Appeal Heard by District Court" (the "NOA").  This appeal is, therefore, timely. Fed. R. Bankr. P. 8002(a)(1).

The Ninth Circuit has adopted the "pragmatic approach" to appellate jurisdiction because "certain proceedings in a bankruptcy case are so distinctive and conclusive either to the rights of the individuals or the ultimate outcome of the case that final decisions as to them should be appealable as of right." Alexander v. Compton (In re Bonham), 229 F.3d 750, 761 (9th Cir. 2000) (quoting In re Frontier Properties, Inc., 979 F.2d 1358, 1362 (9th Cir. 1992)).  Under this approach, "a bankruptcy court order is considered to be final and thus appealable where it 1) resolves and seriously affects substantive rights and 2) finally determines the discrete issue to which it is addressed." Id. (citations omitted).

"Generally, an order denying a motion to dismiss is interlocutory." In re Cherrett, 523 B.R. 660, 665-66 (9th Cir. BAP 2014) (citing In re Hickman, 384 B.R. 832, 836 (9th Cir. BAP 2008).  "But the new provisions added to § 707(b) under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, 119 Stat. 23 (2005) ("BAPCPA"), 'manifest a congressional policy to police all Chapter 7 cases for abuse at the outset of a Chapter 7 proceeding, and … raise pragmatic considerations that indicate that the denial of a § 707(b) motion to dismiss

3

is different from the denial of other motions to dismiss [e.g., Civil Rule 12(b) or §

1112(b)(1)-(4) motions]." Id. at 666 (quoting McDow v. Dudley, 662 F.3d 284, 288

(4th Cir. 2011)).  "Section 707(b) creates a statutory gateway based on whether the

case is abusive, and an order denying that motion to dismiss as abusive, in effect,

finally and conclusively resolves the issue.  If the denial of a § 707(b) motion to

dismiss cannot be appealed immediately to the district court, the Chapter 7

proceedings would have to be completed before it could be determined whether the

proceedings were abusive in the first place." Id.

    In light of the foregoing, the Ninth Circuit has recently confirmed that a

bankruptcy court's denial of a motion to dismiss under 11 U.S.C. § 707(b) is a final

and appealable order. In re Cherrett, 873 F.3d 1060, 1065 (9th Cir. 2017).  As such,

review is appropriate under 28 U.S.C. § 158(a)(1).

### III.  STATEMENTS OF ISSUES ON
### APPEAL AND STANDARDS OF REVIEW

**A.**    **STATEMENT OF THE STANDARD OF REVIEW**

    In reviewing the denial of a motion to dismiss under Section 707(b) where

"the underlying facts are not disputed, the question before the Panel is one in which

legal issues predominate and is thus subject to de novo review." In re Joseph, 208

B.R. 55, 58 (9th Cir. BAP 1997).  The Ninth Circuit "review[s] the bankruptcy

court's conclusions of law de novo and its factual findings for clear error." In re

Price, 353 F.3d 1135, 1138 (9th Cir. 2004).  Mixed questions of law and fact are

reviewed de novo. United States v. Hinkson, 585 F.3d 1247, 1260 (9th Cir. 2009) (en banc). "A mixed question of law and fact exists if historical facts are established, the rule of law is undisputed, and the issue is whether the facts satisfy the legal rule." In re Searles, 317 B.R. 368, 373 (9th Cir. BAP 2004) (internal citations omitted).

## B.   CENTENNIAL'S STATEMENT OF ISSUES PRESENTED ON APPEAL

1.   Did the Bankruptcy Court err in denying Centennial's motion to dismiss the Bankruptcy Case under 11 U.S.C. § 707(b)(1)?

Conclusions of law, mixed findings of law and fact, and conclusions regarding the legal significance applicable to the facts are reviewed de novo. In re Searles, 317 B.R. at 373.   Pure factual determinations (whether Centennial offered evidence regarding the consumer-driven purpose of the Debtor's debt obligations) are reviewed under a clearly erroneous standard. In re Price, 353 F. 3d at 1138.

2.   Did the Bankruptcy Court err in finding that the Debtor's debt obligations as reflected on his schedules, including the $13,964,000 in claimed liabilities owed to Centennial, Zions Bancorporation, and Professional Bank, that was admittedly utilized by the Debtor to pay off or down preexisting personal liabilities, was primarily non-consumer debt?

Conclusions of law, mixed findings of law and fact, and conclusions regarding the legal significance appliable to the facts are reviewed de novo. See 1. above.

**3.**     Did the Bankruptcy Court apply the wrong legal standard when denying the Dismissal Motion and holding that the Debtor's debts are not primarily consumer debts as that term is defined in Bankruptcy Code § 101(8)?

Conclusions of law, mixed findings of law and fact, and conclusions regarding the legal significance appliable to the facts are reviewed <u>de novo</u>. <u>See</u> 1. above.

**4.**     Did the Bankruptcy Court err in holding Centennial to a heightened burden of proof to put forth evidence that the Debtor's debts are primarily consumer debts in light of the fact that the Debtor was unable to provide testimony or information regarding why the Debtor took out these prior loans that were paid off using the proceeds of the Debtor's loan from Centennial, where any lack of evidence was caused by the Debtor?

Conclusions of law, mixed findings of law and fact, and conclusions regarding the legal significance appliable to the facts are reviewed <u>de novo</u>. <u>See</u> 1. above.

## IV.  STATEMENT OF THE CASE<br>AND RELEVANT FACTUAL BACKGROUND

The Debtor is a 29-year-old professional ice hockey player who has played in the National Hockey League for the last eleven (11) years. [CB040, 142, 228].  The Debtor is a party to an employment agreement titled "Standard Player's Contract" (the "Player's Contract") with his current employer, the San Jose Sharks (the "Sharks"), dated May 25, 2018. [CB040, 042, 435-453].  Pursuant to the terms of the Player's Contract, the Debtor is to be compensated $49,000,000 (the "Contract

Salary") over a seven (7) year period (the "Contract Term") commencing on July 1, 2018, and continuing through the conclusion of the 2024-2025 season. [CB435]. The Contract Salary is broken up into two (2) categories: (i) $37,000,000 represents the Borrower's base salary to be paid out over the course of the Contract Term and (ii) $12,000,000 represents a signing bonus (the "Signing Bonus") that is similarly to be paid out over the life of the Contract Term. [CB449-453]. As reflected from the foregoing, the Debtor has substantial earning capacity.

During 2018, and after securing his lucrative Player's Contract, the Debtor approached Centennial for purposes of soliciting a loan (the "Centennial Loan"). From September 2018 through April 30, 2019, the Debtor entered into a lending relationship with Centennial ultimately culminating in Centennial lending $8,000,000 to the Debtor, this being the "Centennial Debt." [CB427-512]. None of the monies received by the Debtor on account of the Centennial Debt were utilized for any business or investment purposes. [CB172-173]. As a source of repayment of the Centennial Debt, the Debtor executed the "Secured Financial Transaction and Security Agreement" (the "Security Agreement") thereby granting Centennial a perfected security interest in the Contract Salary and any other payments due the Debtor under the Player's Contract. [CB455-463]. The Debtor further executed a "Florida Agreement to Waive Garnishment Protection" (the "Garnishment Waiver"), thereby agreeing to waive protection from garnishment otherwise

potentially afforded under Florida law.  The Debtor subsequently defaulted on the Centennial Loan. [CB477].  On January 7, 2021, and pre-bankruptcy, Centennial initiated a loan enforcement action (the "Loan Enforcement Action") in the United States District Court in and for the Southern District of Florida, Fort Lauderdale Division, stemming from the Debtor's multiple defaults under the Centennial Loan. Case No.: 21-CIV-60045-RAR.

On January 9, 2021, two (2) days after Centennial's initiation of the Loan Enforcement Action [CB142], the Debtor filed a voluntary petition (the "Petition") [CB001-074] for chapter 7 relief.  At the time of initiating the Bankruptcy Case, the Debtor was expected to receive payouts from his Contract Salary totaling $29,000,000, all of which the Debtor is slated to receive post-bankruptcy filing.  The Debtor has in fact received hundreds of thousands of dollars since the filing of the Petition.

In filing the Petition, the Debtor checked the boxes on page six of the same indicating that his debts are not "primarily consumer debts" as defined in 11 U.S.C. § 101(8) but instead are "primarily business debts" defined in Part 6 of the Petition as "debts that you incurred to obtain money for a business or investment or through the operation of the business or investment." [CB007].  The Debtor left blank that section of the Petition – question 16.c – that requested the Debtor to "[s]tate the type of debts you owe that are not consumer debts or business debts." [CB007].

8

At the time of filing the Petition, the Debtor filed his Official Form 108 – Statement of Intention for Individuals Filing Under Chapter 7 (the "Statement of Intention") [CB056-57], reflecting the Debtor's intention to not only "[r]etain and continue to pay" the mortgages on three (3) multimillion dollar homes, but to additionally assume two unexpired leases relating to two (2) 2021 Mercedes Benz G-Wagons. [CB057]. While the Debtor has proposed to assume these luxuries, the Petition further indicates that the Debtor does not "estimate that after any exempt property is excluded and administrative expenses are paid that funds will be available to distribute to unsecured creditors." [CB007]. Curiously, on the Debtor's Schedule I:  Your Income ("Schedule I") the Debtor schedules his monthly income to be $2,083.33. [CB040-42].  $2,083.33 is a fraction of the scheduled $93,214.46 worth of expenses the Debtor listed on the Schedule J:  Your Expenses ("Schedule J"); expenses that the Debtor stated he did not expect to "increase or decrease … within the year after" filing the Schedule J. [CB043-45].

On January 31, 2021, the Debtor filed his amended Schedule D:  Creditors Who Have Claims Secured by Property ("Schedule D") and Schedule E/F:  Creditors Who Have Unsecured Claims ("Schedule E/F") [CB075-94], thereby estimating his total debt obligations at $28,191,340 (the "Total Scheduled Debt").  The Total Scheduled Debt consists of, inter alia, the following debt obligations:

i.      $4,230,000 to Scotia Bank across two first-position mortgages on two properties Debtor owns in Canada (the "Scotia Bank Debts") [CB080-81];

ii.     $2,320,000 to Pacific Private Holdings, secured by Debtor's home at 2301 Richland Avenue, San Jose, California 95125 (the "Primary Residence") [CB079];

iii.    $600,000 to 1000658 B.C. Ltd., secured by a second mortgage on two (2) Canadian residences (together, the "Canadian Properties") [CB077];

iv.     $8,360,000 to Centennial, secured by proceeds under the Player's Contract, with this number reflecting the Centennial Debt with interest having been accumulated [CB078];

v.      $3,740,305 (the "Zions Debt") to Zions Bancorporation, N.A. dba California Bank & Trust ("Zions") [CB082];

vi.     $1,354,541.79 (the "Professional Bank Debt") to Professional Bank ("Professional") [CB080];

vii.    $1,101,429.87 (the "South River Debt") to South River Capital ("South River") [CB081]; and

viii.   $2,150,000 to various individuals for unsecured loans (the "Unsecured Debt") [CB084-92].

10

Despite checking the box indicating that his debts are "primarily business debts," the Debtor only identified the Zions Debt and South River Debt as purportedly being "business loans."[2]

On March 24, 2021, Centennial conducted a limited 2004 examination of the Debtor.  During his 2004 examination, the Debtor testified that the purpose of the Centennial Debt, Zions Debt, and Professional Bank Debt (collectively, the "Non-Real Estate Bank Debt"), was to utilize the loan proceeds to pay off outstanding personal debt obligations that the Debtor had incurred (the "Hard Money Loans") [CB172-173, 180-181, 182-183].  However, the Debtor could not recall why he had taken out the Hard Money Loans in the first place, or what those monies were utilized for. [CB176].  The Debtor did confirm, however, that he did not use any of the loan proceeds associated with the Non-Real Estate Bank Debt to purchase any real estate, operate any ongoing business, purchase any operating business, or to invest in any other sort of investment vehicle or activity. [CB172-173, 180-181, 182-183]. The Debtor further testified that the Unsecured Debt, to the extent he could recall, was borrowed and used to pay bills, stay current, pay down credit cards, pay mortgage payments, or to pay other people that the Debtor had borrowed money from. [CB185-188].  Thus, despite swearing under oath that his debts were

---

[2] In his amended Schedule A/B:  Property ("Schedule A/B"), the Debtor identifies that the $750,000 owed to Lone Shark Holdings, LLC (the "Loan Shark Debt"), was a debt incurred for purposes an investment. [CB079].

"primarily business debts" – meaning that they were "debts that [the Debtor] incurred to obtain money for a business or investment or through the operation of the business or investment" – the Debtor's 2004 examination revealed that this was indeed false.

On March 29, 2021, Centennial filed the Dismissal Motion [CB137-156] seeking an order from the Bankruptcy Court dismissing the Bankruptcy Case as an abuse under Sections 707(b)(1), (b)(2), and (b)(3).  In support of the Dismissal Motion, Centennial filed the "Declaration of Andrew J. Ghekas in Support of Centennial Bank's Motion to Dismiss Liquidation [Doc. 83]" (the "Dismissal Declaration") that attached relevant excerpts of the Debtor's 2004 examination testimony. [CB164-205].

On May 4, 2021, the Debtor filed "Debtor's Opposition to Centennial Bank's Motion to Dismiss Liquidation" (the "Dismissal Response") [CB225-241]. Concurrent with the Dismissal Response, the Debtor filed the "Declaration of Evander Kane in Support of Debtor's Opposition to Motion to Dismiss" (the "Kane Dismissal Declaration") [CB242-318].  On May 11, 2021, Centennial filed its reply brief (the "Dismissal Reply") [CB319-347].

On May 18, 2021, the Bankruptcy Court conducted a hearing on the Dismissal Motion.  On May 28, 2021, the Bankruptcy Court entered the Dismissal Order. [CB411-426].  In denying the Dismissal Motion, the Bankruptcy Court held that the

"Debtor's debts are primarily not consumer debts" including the Non-Real Estate Bank Debt. [CB418]. In concluding that the Non-Real Estate Bank Debt was not consumer debt as that term is defined in Section 101(8), the Bankruptcy Court placed the Non-Real Estate Bank Debt into a "gray area" between those debts that are clearly consumer debts and those that are non-consumer debts. [CB417-418].

On June 8, 2021, Centennial filed its NOA. This appeal follows.

## V.  <u>SUMMARY OF ARGUMENT</u>

The Bankruptcy Code defines "consumer debt" as debt that is incurred by the Debtor primarily for a personal, family, or household purpose. The purpose turns on the Debtor's reasons for incurring the debt. In the case at bar, the Debtor's own testimony is that he incurred a substantial amount of his listed debt in order to pay bills, keep current, and pay off pre-existing personal debt obligations or were not utilized for a commercial purpose. This constitutes quintessential-consumer debt.

Since the Debtor's debts are primarily consumer debts, the Bankruptcy Court's ruling that Section 707(b) does not apply should be reversed. Moreover, the matter should be remanded for a determination of whether the Debtor's ability to pay his debts from his approximately $7,000,000 annual income constitutes an abuse of chapter 7. The Bankruptcy Court's denial of the Dismissal Motion allows the Debtor to skate by on his substantial debt obligations while at the same time

maintaining all the lucrative benefits associated with his anticipated multimillion dollar earnings as a professional ice hockey player.

## VI.  <u>ARGUMENT</u>

Bankruptcy Code § 707(b)(1) provides, in relevant part, that "[a]fter notice and hearing, the court … on a motion by … any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts … if it finds that the granting of relief would be an abuse of the provisions of this chapter." 11 U.S.C. § 707(b)(1).

The term "consumer debt" is defined by the Bankruptcy Code.  Section 101(8) provides that "'consumer debt' means debt incurred by an individual primarily for a personal, family, or household purpose."  Consumer debt, "for purposes of 707(b), 'serves to direct the Court's attention to a type of bankruptcy case which is especially liable to abuse and especially deserving of review.'" <u>In re Steiner</u>, 2020 WL 2027250 at *2 (Bankr. S.D. Ill. Jan. 29, 2020) (quoting <u>In re Stewart</u>, 201 B.R. 1002, 1004 (Bankr. N.D. Okla. 1996)).  "Courts determine the debtor's purpose as of the time the debt was incurred." <u>In re Cherrett</u>, 873 F.3d at 1067.

"In considering whether a debt is consumer, courts have formulated several definitions.  Many have used the 'profit motive' test wherein a debt is not consumer if it was incurred with an eye toward profit." <u>In re Kersten</u>, No.: 17-13739-7, 2018 WL 2413829 at *1 (Bankr. W.D. Wis. May 25, 2018) (citing <u>In re Booth</u>, 858 F.2d

1051, 1055 (5th Cir. 1988) and In re Terzo, 502 B.R. 553, 557 (Bankr. N.D. Ill. 2013)).  "Other courts have held that consumer debt must be incurred by volition. Under this theory, courts have declined to classify consumer debts as those that arose involuntarily, such as tax liabilities and tort judgments." Id. 2018 WL 2413829 at *2 (citing IRS v. Westberry (In re Westberry), 215 F.3d 589, 591 (6th Cir. 2000) and In re Marshalek, 158 B.R. 704, 707 (Bankr. N.D. Ohio 1993)).  And then finally, "[i]n at least one case, the court additionally reasoned a consumer debt 'normally involves the extension of credit' to a consumer." Id. (quoting Westberry, 215 F.3d at 591).

As analyzed below, the Bankruptcy Court ignored the Debtor's stated intended purpose in incurring certain debt obligations, and instead chose to utilize a body of nonbinding case law that is ill fitted to the present fact pattern.  Accordingly, this Court should reverse the Bankruptcy Court's denial of the Dismissal Motion and reverse with instructions for the Bankruptcy Court to conduct further hearings to determine whether or not the Debtor's initiation of the Bankruptcy Case constitutes an abuse under Bankruptcy Code § 707(b)(1), (b)(2), or (b)(3).

## A.    THE DEBTOR'S STATED PURPOSE IN INCURRING THE CENTENNIAL DEBT

"[T]he key factor in determining whether a secured debt is consumer debt lies in the debtor's purpose in incurring" it. In re Cherrett, 523 B.R. at 670.  "Where a debt was incurred for more than one purpose, the primary purpose of the debt will

determine its nature." Id. (citing Price 353 F.3d at 1139; In re Strausbaugh, 376 B.R. 631, 639 (Bankr. S.D. Ohio 2007)).   The Debtor testified that he incurred the Centennial Debt in order to pay off or down other preexisting debt obligations – the Hard Money Loans. [CB166, 172-173, 180-181, 182-183].   And while the Debtor has previously classified said loans as "business loans," he only did so because "that's what the documents said," not because that was his purpose in incurring them – in fact, the Debtor could not remember why he took out nearly $14,000,000 in loans. [CB176-178].   The act of voluntarily incurring a debt in order to deal with preexisting personal financial difficulties is a quintessential consumer purpose that not only benefits the Debtor, but ultimately his family and household.   The Debtor even tacitly admits that the Centennial Debt is to be properly considered consumer debt, as he has agreed that the $100,000 loan incurred from Raj Bhangu is to be classified as a consumer debt even though the same was used to stay current on past due bills and make up late payments – i.e. to address personal financial difficulties. [CB187, 233].

Another factor that requires a finding that the Centennial Debt is a consumer debt is the fact that the Debtor voluntarily incurred the same for a non-business, consumer purpose.   "When determining whether a non-business debt is a consumer debt, courts often consider whether the individual voluntarily intended to incur the debt for a personal, family, or household purpose." Alvarez Velez, 617 B.R. 158,

170 (1st Cir. BAP 2020) (citing In re Marshalek, 158 B.R. at 707 ("Implicit in the Code's definition of consumer debt is the element of volition.")).   As one court explained, "a consumer debt is one that is 'incurred' – implying that some voluntary action is taken before a consumer becomes liable on the debt." Id. (quoting In re Stovall, 209 B.R. 849, 854 (Bankr. E.D. Va. 1997)).   Even if the action leading to the liability may have been intentional – i.e. breach of contract or intentional tort – if the debtor did not intentionally incur the debt or judgment, it will not be considered consumer debt for purposes of 11 U.S.C. § 101(8). Id. (citing cases).   This approach fits squarely into the common meanings of the terms utilized by the Bankruptcy Code in defining "consumer debt."   To be sure, the term "Incur" means "to become liable to or to bring it down on oneself." In re Durant, 586 B.R. 212, 219 (Bankr. D. Md. 2018).   The term "primarily" means "of the first important or … fundamental." Id.   And the term "purpose" means "an intention or an object set before oneself as an aim." Id. (citing In re Grillot, 2017 WL 4286882, at *4 (Bankr. D. Kan. Sept. 22, 2017) (defining "purpose" to mean "'that which one sets before him to accomplish; an end, intention, or aim, object, plan, project'")).   Accordingly, "[t]he core of the consumer debt definition thus concerns debt that an individual debtor undertakes to serve her private affairs." Id., 586 B.R. at 219; see also In re White, 49 B.R. 869 (Bankr. W.D. N.C. 1985) ("Thus, to be a consumer debt within the meaning of §

17

101(7) the liability must have been acquired first and foremost to achieve a personal aim or objective.").

In these regards, courts have characterized debts stemming from adverse judgments associated with tortious or negligent acts – such as automobile accident liability – do not constitute consumer debt. See, e.g. In re White, 49 B.R. at 872; In re Marshalek, 158 B.R. at 707; In re Peterson, 524 B.R. 808, 812 (Bankr. S.D. Ind. 2015). Similarly, several courts have held tax debts are not consumer debts, as they are imposed rather than voluntarily incurred, such debts are levied for a public purpose and not incurred for personal or household purposes. See In re Zgonina, No.: 19-90467, 2019 WL 6170776 at *3 (Bankr. C.D. Ill. Nov. 19, 2019) (citing In re Westberry, 215 F.3d at 591 and In re Greene, 157 B.R. 496, 497 (Bankr. S.D. Ga. 1993)). In both examples, the determinative factor is the issue of volition. See In re Marshalek, 158 B.R. at 707 ("Implicit in the Code's definition of consumer debt is the element of volition"). Conversely, courts have held that "[r]eceiving medical treatments and services, on the other hand," is consumer debt as it "is personal and provides a direct traceable benefit to a debtor or the debtor's dependents." In re Zgonina, 2018 WL 6170776 at *3.

Here, the Debtor voluntarily incurred the Centennial Debt and did so with a primary objective of refinancing personal obligations – that, again, the Debtor voluntarily become liable on. [CB172-173]. Accordingly, the Debtor's purpose in

18

using the Centennial Debt was personal, for his own benefit, and ostensibly for the benefit of his family and household.

**B.   THE DEBTOR'S TOTAL DEBT OBLIGATION DOES NOT CONSTITUTE PRIMARILY BUSINESS DEBT AS THE DEBTOR FALSELY CLAIMED**

In filing his Petition with the Bankruptcy Court, thereby initiating the Bankruptcy Case, the Debtor indicated that his debts were not "primarily consumer debts" but were instead "primarily business debts" defined in Part 6 of the Petition as "debts that you incurred to obtain money for a business or investment or through the operation of the business or investment." [CB007].  The Debtor then affixed his electronic signature to Part 7 of the Petition, thereby "declar[ing] under penalty of perjury that the information provided is true and correct" and further indicating his understanding that "making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571." [CB007].  The Debtor has never amended his Petition or Schedules to change his original characterization of his debt, despite having amended them in other areas. [CB076, 096, 107, 118].

The Debtor's decision to intentionally mismark his Petition is understandable, as it is well settled within the Ninth Circuit that "debt incurred for business ventures or other profit-seeking activities does not qualify" as consumer debt. In re Hill, 268 B.R. 548, 552 (9th Cir. BAP 2001); In re Kelly, 841 F.2d 908, 913 (9th Cir. 1988)

("Debt incurred for business ventures or other profit-seeking activities is plainly not consumer debt for purposes of section 707(b)."); In re Cherrett, 523 B.R. at 669 ("courts generally ascribe a business purpose, rather than a personal, family or household purpose to debts which are incurred 'with an eye toward profit' and which are 'motivated for ongoing business requirement.'").

However, despite the Debtor's false sworn testimony to the contrary, there is no doubt that the Debtor's debts are not "primarily business debts."  Unrefuted by the Debtor, and in fact subsequently admitted by the debtor at his 2004 examination, the Debtor testified that none of the proceeds received by the Debtor – or on the Debtor's behalf – from the Non-Residential Bank Debt were used to (i) purchase any real property, (ii) purchase any operating business, (iii) fund any operating business, or (iv) invest in any other business enterprise or investment opportunity. [CB146, 171-172, 180-181, 182-183].  The Debtor's sworn schedules further confirm that the Debtor (i) does not own any bonds, investment accounts with any brokerage firms, money market accounts, or stock in any publicly traded company [CB014], (ii) does not own or hold any legal or equitable interest in any business-related property [CB017], (iii) does not receive any net income from rental property or from operating a business, profession, or farm [CB041], and (v) has not owned a business or had any connection to a business within the last four (4) years preceding the Debtor's initiation of the Bankruptcy Case. [CB054].  There is simply nothing in the

record below which in any way indicates that the Debtor has been engaged in any business other than the business of playing professional ice hockey.

Accordingly, it cannot be gainsaid that the Debtor's debts are not "primarily business debts" despite the Debtor's false statement to the contrary.

## C. THE BANKRUPTCY COURT'S MANUFACTURING OF A "GRAY AREA"

With the Debtor's stated purpose for acquiring the Non-Real Estate Bank Debt being towards outstanding personal financial obligations, and with Centennial going one step further in having effectively refuted the proposition that the Debtor's debts are "primarily business debts," all that remained was to properly classify the Debtor's debts as being primarily consumer in nature as Centennial and the evidence had shown.  But in failing to find that the Debtor's debts are primarily consumer debts, the Bankruptcy Court conjured a "gray area" "where debts could not easily be classified as either consumer or non-consumer" despite not constituting business debts. [CB007-8].

In reaching its erroneous conclusion that the Centennial Debt constituted a non-consumer debt obligation despite the Debtor admitting that the same was incurred in light of personal financial difficulties, the Bankruptcy Court relied heavily upon the decision and analysis set forth in In re Garcia, 606 B.R. 98 (Bankr. D.N.M. 2019). [CB007].  However, a more thorough review of the In re Garcia fact pattern confirms that it itself does not even fit within the interstitial "gray area" that

it sought to manufacture.  In <u>In re Garcia</u>, the husband and wife duo of Jody and Richard Garcia (together, the "Garcias") initially sought protection under chapter 7 of the Bankruptcy Code and later moved to convert the same to one under chapter 11, which was granted. <u>Id.</u> at 100.  The Garcias later sought to reconvert their bankruptcy case to chapter 7; however, in order to successfully reconvert their bankruptcy case to one under chapter 7, the Garcias were required to first demonstrate that their obligations to creditors were not "consumer debt," as there was a pending motion that the bankruptcy case should be dismissed for substantial abuse under 11 U.S.C. § 707(b). <u>Id.</u>  The primary debt at issue was Ms. Garcia's endorsement liability associated with her having co-signed her father's, Bruce Cantrell, loans connected to his purchase of the Cuchara Mountain ski area and refinancing of the same.  Mr. Cantrell's ultimate goal was to reopen and expand the ski area into an all-seasons resort. <u>Id</u>. at 102.

Ultimately the Garcias were required to seek bankruptcy protection and the bankruptcy court was faced with classifying Ms. Garcia's endorsement liability as a consumer or non-consumer debt. <u>Id.</u> at 105.  Although the <u>Garcia</u> court identified non-consumer debts to include debts incurred with a profit motive or for business ventures and commercial transactions, it initially found that Ms. Garcia's endorsement liability "did not fall neatly into [this] category." <u>Id.</u> at 105.  The <u>Garcia</u> court then went on to identify seven (7) principles surveyed from relevant case law

22

to provide "guidance" in how to determine debts in this perceived "gray area." Id. However, such an experimental exercise was unnecessary, as Ms. Garcia's endorsement liability was so clearly a non-consumer business debt, as it was directly tied to her father's operation and refinancing of the ski area.  Moreover, Ms. Garcia negotiated reimbursement, interest, and a ten (10%) percent joint venture interest in exchange for the endorsement. Id. at 107.  She even further deducted the interest she paid on the loans from her taxable income, something she could only have taken the deduction for a business or investment interest expense. Id. at 104.  Accordingly, there actually was no "gray area" present in In re Garcia. See, e.g. In re Straughter, 219 B.R. 672, 682 (Bankr. E.D. Penn. 1998) (holding that wife's guaranty of husband's business debt was not a consumer debt as "[t]here was no evidence concerning Mrs. Staughter's individual purpose, but assuming arguendo, that it was family oriented, the focus is on what the debt was intended to service.  In this case, the obligation provided funds for Mr. Staughter's business.") (emphasis in original); In re Grillot, 578 B.R. 651, 657 (Bankr. D. Kan. 2017) ("An individual's guaranty of a business or commercial debt is generally a non-consumer debt").

In adopting the Garcia analysis to the case at bar, the Bankruptcy Court applied the incorrect legal rule to the relief requested thereby ignoring Ninth Circuit precedent.  The "key factor" is to look at the Debtor's primary purpose in determining the nature of the debt.

23

**D.     IN IGNORING THE DEBTOR'S PURPOSE IN ACQUIRING THE CENTENNIAL DEBT, THE BANKRUPTCY COURT HAS CREATED AN UNESTABLISHED ALTERNATIVE PURPOSE**

Instead of merely accepting the Debtor's admitted personal purpose for incurring the Centennial Debt and other Non-Real Estate Bank Debt, both the Bankruptcy Court and the Debtor lodged a series of misguided arguments that were unsupported by both the applicable facts and law.  To be sure, the Debtor failed to even support his false statement that his debts were "primarily business debts," choosing not to disclose what the proceeds from the Hard Money Loans were used for in the Dismissal Response. [CB225-241, 242-318].

Instead, the Debtor relied upon the sole argument that because the Centennial Debt and other Non-Real Estate Bank Debt were secured and included "loan agreements, promissory notes, and sophisticated transactional documents" they must be considered non-consumer debt. [CB234].  However, consumer debt can be both secured and unsecured debt. In re Kelly, 841 F.2d at 912.  Moreover, "[c]ourts must look at the substance of the transaction and the borrower's purpose in obtaining the loan, rather than merely looking at the form of the transaction." In re Martin, 2013 WL 5423954 at *6 (Bankr. S.D. Tx. Sep. 26, 2013) (citing Riviere, et al. v. Banner Chevrolet, Inc. et al., 184 F.3d 457, 562 (5th Cir. 1999)).

The Bankruptcy Court further opined that because the "Debtor refinanced for better terms [ ] he effected a transaction that increased his economic value," and that

24

this somehow "further shows that this debt was not incurred for a consumer purpose." [CB420]. Such an argument is nonsensical. For example, if a debtor were to have incurred a loan in order to purchase residential property that he intended to utilize as his primary residence, such a loan would unquestionably be classified as a consumer debt. If the same debtor later refinances his home to obtain a lower mortgage payment – thereby increasing his economic value – the same does not alter the purpose of the loan which was primarily for personal, family, and household use. See In re Liegey, No.: 1:09-bk-00661MDF, 2009 WL 3817902 at *1 (Bankr. M.D. Penn. Nov. 13, 2009) (holding that debtor and his wife's Wells Fargo debt, which was incurred to refinance their home to obtain lower mortgage payments, was a consumer debt). Similarly, in In re Whitelock, 122 B.R. 582 (Bankr. D. Utah 1990), the debtor took out a loan from First Security Financial (FSF), secured by his mother's single-family home, to pay IRS liability. Id. at 584. The debtor then took out a second note to pay off the first note; this second note was secured by a deed of trust on the same residence. Id. at 585-86. The debtor filed for bankruptcy under Chapter 13 approximately three months later. Id. The bankruptcy court found that these obligations secured by real property may be considered consumer debt, despite some language in the legislative history of § 101(7) – the precursor to § 101(8) – which states that consumer debt does not include debt secured by real property. Id. at 587. The court looked to the purpose of the debt, concluding that the second loan,

which was used to pay off the first loan that paid the IRS debt, served "a family or household purpose." Id. at 587.

The two foregoing authorities further discount the Bankruptcy Court's erroneous conclusion that because "no consumption occurred when Debtor incurred the Centennial Debt" is a "point against Centennial Debt being consumer debt." [CB421]. In both In re Liegey and In re Whitelock, "[m]oney changed hands," but the money did not go directly to the debtors, and yet, despite the absence of consumption itself, they still constituted consumer debt obligations based upon the purpose of the loans.

The Bankruptcy Court further erred in its analysis of the South River loan. The Bankruptcy Court reasoned that because the South River loan characterizes itself as a business loan and "even states explicitly that the loan proceeds are for business expenses," that it "must presume that the Debtor understood he was signing documents to apply for a business loan with … South River.  To find Debtor incurred these debts with a consumer purpose, I would have to find he signed these documents with fraudulent intent.  At a minimum, I would have to find Debtor lied when he signed the South River loan documents, as those documents explicitly state the proceeds were solely for business related expenses." [CB422-423].  The Bankruptcy Court concluded that Centennial had not presented any evidence that would support a finding that the Debtor did in fact lie to South River. [CB423].  However, this

26

ignores the both the record evidence in support of the Dismissal Motion as well as the Debtor's own sworn testimony. The Debtor testified at his 2004 Examination that the South River funds were utilized – once again – "to help pay off some debt"; he simply could not remember "what specific money was used to pay off at the time." [CB181-182]. The Debtor later submitted a declaration in support of the Dismissal Opposition, in which the Debtor declares, under penalty of perjury, that

> The proceeds from the South River loan did not go from escrow directly to existing lenders. The loan proceeds approximately $520,000 (after deducting almost $80,000 for origination fees, interest reserve, insurance and legal fees) were deposited into my bank account. I used the proceeds for various obligations, such as paying the mortgage debt on the Canadian properties, paying credit card bills, and paying of individual loans.

[CB229-230]; see also [CB230 (admitting that the South River loan was deposited into Kane's bank account and used for various obligations)]. The Debtor's own testimony invalidates the Bankruptcy Court's conclusion and review of the record before it. The Debtor did in fact lie when he signed the South River loan documents, much like the Debtor lied when he signed the Petition indicating that his debts were "primarily business debts."

The Bankruptcy Court goes on to make the tortured comparison of the Debtor here to the debtor in In re Cherrett, likening Centennial's taking of a security interest in the Debtor's Player's Contract as well as obtaining the D&D Policy to the

27

creditor-employer's in <u>Cherrett</u> extension of a loan to the debtor-employee as an inducement to accept a new employment opportunity. [CB423-424].

The obvious distinction between <u>Cherrett</u> and the case at bar, is that in <u>Cherrett</u> the debtor incurred a housing loan from his then employer as a key part of the debtor's compensation package with said employer. 873 F.3d at 1062.  In fact, the housing loan was expressly negotiated as part of the debtor's decision to change companies and relocate. <u>Id.</u> at 1063.  "In negotiations regarding [the debtor's] compensation, Aspen eventually offered a $500,000 housing loan (Housing Loan) in addition to an annual salary of $300,000.  The Housing Loan was interest-only for the first ten years and it was coupled with a bonus plan providing Cherrett a guaranteed annual bonus of up to $33,750 to cover the interest payments on the loan." <u>Id.</u>  This was structured to ensure that "Cherrett would have no out-of-pocket expenses related to the loan." <u>Id.</u>  The <u>Cherrett</u> court ultimately concluded that the debtor's purpose in acquiring the Housing Loan was primarily business driven – in that the debtor only incurred it as part of his compensation package with a new employer and in order to "leave a secured position" and have the chance to "work at a very prestigious, top of the line, equal to the Four Seasons, equal to the best hotels in the world," resort. <u>Id.</u> at 1068.  The court reasoned that "[t]his is not the ordinary situation where a person takes out a loan to move closer to a job for convenience or better schools, for example.  This is the unusual situation where a person accepts a

loan from his employer as part of a larger transaction to further his career." Id. at 1069.

In contrast, the Centennial Debt is not a loan extended to the Debtor by his employer the Sharks.  Nor is it a loan that is in any way connected to Kane's progression as a professional ice hockey player.  In fact, the opposite is true, as Kane has taken the position that he would opt-out or terminate his Player's Contract rather than make good on the substantial amount of debt he incurred from his creditors to support his lavish and excessive lifestyle. [CB42].  The Centennial Debt, as well as all of the debt incurred by the Debtor, does not make the Debtor any better or worse hockey player, or preclude or facilitate his playing career in any way.

The Bankruptcy Court's decision to force the Cherrett analysis onto the incompatible fact pattern before it has caused the Bankruptcy Court to ultimately reach the illogical inference that the "Debtor's purpose in incurring the 'Business' Loans was also related to his employment, rather than being purely personal." [CB423-424].  When the Debtor has already testified that his purpose in obtaining the Centennial Debt was to pay off other personal obligations, the Bankruptcy Court should not venture so far offsides to find an alternative purpose.  Accordingly, this Court should reverse the Bankruptcy Court's order denying the Dismissal Motion.

**E.    THE DEBTOR'S TOTAL DEBT OBLIGATION IS PRIMARILY CONSUMER DEBT, NOT BUSINESS DEBT AND NOT NON-CONSUMER DEBT**

When properly considering the Centennial Debt as "consumer debt" as it must be in light of the Debtor's stated purpose in acquiring the same, the Debtor's total debt obligations as reflected on his Schedules are primarily consumer debt – not primarily non-consumer debts, and certainly not primarily business debts as the Debtor falsely contended.

To be sure, the Debtor admits that the (i) $486,000 loan from 1000568 B.C. Ltd., (ii) $2,320,000 loan from Pacific Private Holdings, (iii) $79,791 credit obligation owed to Wells Fargo, and $100,000 loan from Baj Bhangu, all constitute consumer debt obligations, totaling $2,985,791. [CB233].  It is also uncontroverted that the Debtor has listed an additional $2,150,000 of additional unsecured loans that the Debtor incurred from various friends and family in order to pay bills and monthly expenses that also constitute consumer debt [CB084-92] – for a new total of $5,135,791 of undisputed consumer debt.

The combined total of the Non-Residential Bank Debt represents $13,964,000 of consumer debt. [CB078, 80, 82].  The Non-Residential Bank Debt coupled with the other identified consumer debt equates to a total of $19,099,791.  Given that the Bankruptcy Court found the Debtor's total debt to equal $28,191,340, the Debtor's consumer debt obligations represent approximately sixty-eight (68%) percent of the Debtor's total debt obligations.  Thus, the Debtor's total debt obligations are

"primarily" consumer debt – not "business debts" as the Debtor erroneously marked on his Petition.

**F.   THE BANKRUPTCY COURT PLACED AN IMPROPER BURDEN ON CENTENNIAL AND EXCUSED THE DEBTOR'S OWN IGNORANCE**

While the movant may bear the burden of proof with regard to a dismissal pursuant to Section 707(b)(1), the debtor bears the burden of demonstrating a debt is non-consumer. See In re Ferreira, 549 B.R. 232, 237 (Bankr. E.D. Cal. 2016). This burden shifting is in line with other areas of means testing, such as the requirement that debtors substantiate additional expenses for telecommunication services and childcare costs. See McDow v. Meade (In re Meade), 420 B.R. 291, 303-04 (Bankr. W.D. Va. 2009) ("It makes more sense to require the debtor to prove both that such additional claimed expenses are actually being incurred and that they are reasonably 'necessary' for the health and welfare of the household rather than obligating the United States Trustee to try and prove the opposite."); In re Montalto, 537 B.R. 147, 154 (Bankr. E.D.N.Y. 2015) ("it makes entirely more sense that, once questioned, the Debtor be required to prove the expense with documentary evidence. The Debtor is the party with access to proof on the point, and should be required to substantiate actual expenses.  If the Debtor is able to substantiate expenses that are called into question, then the burden shifts back to and rests with the UST to prove that the bankruptcy filing was abusive."); see also In re Scurlock, 385 B.R. 814, 816-17 (Bankr. M.D.N.C. 2009); In re Plumb, 373 B.R. 429, 440 (Bankr. W.D.N.C.

2007); see also In re Liegey, No.: 1:09-bk-00661MDF, 2009 WL 3817902 at *4 (Bankr. M.D. Penn. Nov. 13, 2009) ("Once the UT established that the Wells Fargo loan was obtained by Debtor and his wife to address their personal financial difficulties, the burden shifted to Debtor to demonstrate that the loan was at least partially used for business purposes.").

An application of the facts of this case – and the Bankruptcy Court's application of the same - demonstrates why it makes more sense to require the Debtor to prove that the Non-Residential Bank Loans were in fact non-consumer – as the Debtor himself did not allege. [C0B7].  In placing the burden solely on Centennial, the Bankruptcy Court reasoned that "Debtor stated under penalty of perjury in his petition that his debts are primarily not consumer debts.  So at a minimum, even under Ferreira's approach Centennial has a burden to produce evidence sufficient to create a genuine dispute of material fact whether Debtor's debts are primarily consumer debts." [CB419].  However, the Debtor did much more than state "under penalty of perjury" that his debts are "primarily not consumer debts"; the Debtor further stated under penalty of perjury that his debts are "primarily business debts" that the Debtor "incurred to obtain money for a business or investment or through the operation of the business or investment." [CB007].  The Debtor expressly disavowed the proposition that his debts were simply "non-consumer" debt other than those that can be properly classified as business debts, as

32

the Debtor – when presented the opportunity in the Petition – failed to "[s]tate the type of debts you owe that are not consumer debts or business debts." [CB007].  And despite these sworn statements, Centennial was able to prove through the Debtor's own testimony that the same are intentionally false.

The Bankruptcy Court erroneously concluded that "Centennial could argue, but did not, that the lack of evidence is due to Debtor's inability to recall why he took out the high interest loans the Centennial Debt was used to partially pay off." [CB421].  However, this is precisely what Centennial argued and why it is more fitting for the burden to be placed on the Debtor.  Specifically,

> And when we asked Mr. Kane what his other debt obligations were for, his testimony reflects that he can't recall.  He doesn't know.  He doesn't know why he took out nearly fourteen million dollars' worth of debt. And that's his sworn testimony both at his 341 examination and his 2004 examination, and we've attached those experts to our - - excerpts to our moving papers.
>
> And so we cite the Carrera [sic] case out of the Bankruptcy Eastern District of California where although Centennial has the burden under 707(b)(1), the burden is on Mr. Kane to then come forward and demonstrate that there's a profit motive in order to establish that the debt is nonconsumer or a business debt.  And Mr. Kane has not done so, and he cannot do so because he can't recall what these originally loans were even taken out for.  All he knows is that these newer loans, the Centennial loan, the Zions loan, Professional Bank loans, were not used for business venture but instead were used to pay off other personal obligations that he had.

[CB356].

> I think that is part - - the line of questioning is part of the analysis, but then when we also asked him what the purpose of the prior loans were

for, these high-interest loans, Mr. Kane couldn't give us any information.

And so if these new loans taken out from Centennial and the other banks were used to pay off these other loans and Mr. Kane is unable to tell us what exactly these other loans were for, it's difficult for Centennial to sort of prove what Mr. Kane himself doesn't know, which is whether or not these loans were used for any profit-seeking motive or business venture or anything. For all we know, and for all Mr. Kane knows, these were loan obligations that he took out for personal use. And surely, taking out these newer loans to pay off personal debt would be a personal use.

[CB370-371].

The import of BAPCPA and the Means Test was to reduce those eligible for a chapter 7 discharge and increase those required to file a chapter 13 reorganization repayment plan by establishing a criterion under which the presumption of abuse would be deemed to arise. 11 U.S.C. § 707(b)(2)(A). If any debtor can escape the application of Bankruptcy Code § 707(b) and the stated purpose of Congress simply by claiming amnesia when it best suits him, then the entire bankruptcy framework is open to abuse. Congress has shown no indication that courts should develop new ways for high-income debtors to file otherwise abusive chapter 7 petitions.

## VII.  <u>CONCLUSION</u>

"Congress added [Section 707(b)] to the Bankruptcy Code in response to concerns that some debtors who could easily pay their creditors might resort to chapter 7 to avoid their obligations." <u>In re Price</u>, 353 F.3d 1135, 1138. As explained above, the Non-Residential Bank Debt was voluntarily incurred by the Debtor – not

34

for a business purpose as sworn to in his Petition and Schedules – but in order to manage his own personal financial difficulties associated with Hard Money Loans. When properly classified, the Debtor's debt obligations are primarily consumer in nature. The issue turns on the Debtor's purpose in obtaining the loans – not on the purported complexity of the lending arrangement, the size of the loan, or the Debtor's sudden case of forgetfulness. That purpose was for a personal, family, and household means.

Based on all of the foregoing, Centennial respectfully requests that this Court reverse the denial of the Dismissal Motion and remand this matter for determination of whether the Debtor's ability to pay his debts as well as his pre-Petition and post-Petition conduct constitutes an abuse under Section 707(b).

DATED:  September 21, 2021        ANTHONY & PARTNERS, LLC

By:    _/s/ John A. Anthony_____
       John A. Anthony
       Attorneys for CENTENNIAL BANK

DATED:  September 21, 2021          COOPER, WHITE & COOPER LLP


                                    By:  _____*/s/ Peter C. Califano*_____
                                         Peter C. Califano
                                         Attorneys for CENTENNIAL BANK

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief complies with:  (a) the type-volume limitations of Fed. R. Bankr. P. 8015(a)(7)(B) because, excluding the parts of the brief exempted by Fed. R. Bankr. P. 8015(g), it contains 8,466 words; and (b) the typeface and type-style requirements of Fed. R. Bankr. P. 8015(a)(5) and 8015(a)(6), respectively, because it uses a proportionally-spaced typeface using Microsoft Word in 14 point Times New Roman font.

DATED:  September 21, 2021    ANTHONY & PARTNERS, LLC

By:       */s/ John A. Anthony*
       John A. Anthony
       Attorneys for CENTENNIAL BANK

DATED:  September 21, 2021    COOPER, WHITE & COOPER LLP

By:       */s/ Peter C. Califano*
       Peter C. Califano
       Attorneys for CENTENNIAL BANK

1510178.1