No. 3:21-cv-04597-WHO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: EVANDER FRANK KANE,

*Debtor.*

CENTENNIAL BANK,

*Appellant*,

v.

EVANDER FRANK KANE,

*Appellee.*

On Appeal from the United States Bankruptcy Court
for the Northern District of California
Bankr. No. 21-50028-SLJ
Hon. Bankruptcy Judge Stephen L. Johnson

## APPELLEE'S RESPONSIVE BRIEF

Stephen D. Finestone
Ryan A. Witthans
FINESTONE HAYES LLP
456 Montgomery Street, Floor 20
San Francisco, CA 94104
(415) 606-0466
sfinestone@fhlawllp.com
rwitthans@fhlawllp.com

*Attorneys for Appellee,*
EVANDER FRANK KANE

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ ii

INTRODUCTION ......................................................................................1

ISSUES PRESENTED AND STANDARDS OF REVIEW ...........................3

    I.    Issues Presented ............................................................3

    II.   Standard of Review ........................................................3

STATEMENT OF THE CASE ..................................................................7

    I.    Background and Events Prior to Kane's Bankruptcy .........................7

    II.   Information about Kane's Debts ............................................9

        A.  Secured Debts ...........................................................9

        B.  Unsecured Debts .......................................................11

    III.   Centennial's Dismissal Motion .........................................12

    IV.   Kane's Opposition to the Dismissal Motion ..............................13

    V.   Hearing on the Dismissal Motion ........................................14

    VI.   The Bankruptcy Court's Ruling .........................................14

SUMMARY OF THE ARGUMENT ..........................................................15

ARGUMENT ........................................................................................16

    I.    Background Regarding Section 11 U.S.C. § 707(b)..........................16

    II.   The Bankruptcy Court Properly Denied the Dismissal Motion ........22

        A.  Legal Standard on a Motion to Dismiss .........................22

        B.  Centennial's Argument in its Dismissal Motion ..........................25

        C.  The Bankruptcy Court's Ruling .....................................28

        D.  Centennial's Argument on Appeal .................................31

CONCLUSION.......................................................................................33

CERTIFICATION OF COMPLIANCE FOR BRIEFS ................................34

# TABLE OF AUTHORITIES

## Cases

*Aspen Skiing Co. v. Cherrett (In re Cherrett)*, 873 F.3d 1060 (9th Cir. 2017) passim

*Blausey v. United States Trustee*, 552 F.3d 1124 (9th Cir. 2009) ............................3

*Bushkin v. Singer (In re Bushkin)*, 2016 Bankr. LEXIS 2688 (B.A.P. 9th Cir. July 22, 2016) ...........................................................................................................20

*Citizens Nat'l Bank v. Burns (In re Burns),* 894 F.2d 361 (10th Cir. 1990) ...........23

*Conde-Vidal v. Pinto-Lugo (In re Velez)*, 617 B.R. 158 (B.A.P. 1st Cir. 2020) ... 32, 33

*El Paso v. Am. W. Airlines, Inc. (In re Am. W. Airlines, Inc.)*, 217 F.3d 1161 (9th Cir. 2000) ....................................................................................................31

*Harris v. United States Trustee (In re Harris)*, 279 B.R. 254, 259 (B.A.P. 9th Cir. 2002) ..........................................................................................................22

*In re Almendinger*, 56 B.R. 97 (Bankr. N.D. Ohio 1985) ......................................20

*In re Cherrett*, 523 B.R. 660 (B.A.P. 9th Cir. 2014) ....................................... 22, 32

*In re Circle Five, Inc.*, 75 B.R. 686 (Bankr. D. Idaho 1987)...................................20

*In re Constantino*, 72 B.R. 189 (Bankr. D.S.C. 1986)............................................24

*In re Damond*, 586 B.R. 212 (Bankr. D. Md. 2018).............................................32

*In re Ferreira*, 549 B.R. 232 (Bankr. E.D. Cal. 2016) .................................... 22, 23

*In re Garcia*, 606 B.R. 98 (Bankr. D.N.M. 2019) .......................................... 24, 25

*In re Kersten*, No. 17-13739-7, 2018 Bankr. LEXIS 1546, 2018 WL 2413829 (Bankr. W.D. Wis. May 25, 2018)...................................................................32

*In re Price*, 353 F.3d 1135 (9th Cir. 2004) ..........................................................3, 18

*Matter of Booth*, 858 F.2d 1051 (5th Cir. 1988).....................................................20

*Meyer v. Hill (In re Hill)*, 268 B.R. 548 (B.A.P. 9th Cir. 2001) ..................... 20, 23

*Nagy v. Grp. Long Term Disability Plan for Emples. of Oracle Am., Inc.*, 739 F. App'x 366 (9th Cir. 2018) ...............................................................................7

*Ocean Garden, Inc. v. Marktrade Co.*, 953 F.2d 500 (9th Cir. 1991).....................7

*Palmer v. Laying*, 559 B.R. 746 (D. Colo. 2016) ..................................................22

*Pullman-Standard, Div. of Pullman v. Swint*, 456 U.S. 273 (1982).........................4

*Stine v. Flynn (In re Stine)*, 254 B.R. 244 (B.A.P. 9th Cir. 2000)..........................20

*U.S. Bank N.A. v. The Village at Lakeridge, LLC*, 138 S. Ct. 960 (2018)........ 4, 5, 6

*United States v. Carlson*, 900 F.2d 1346 (9th Cir. 1990) ......................................31

*United States v. Hinkson*, 585 F.3d. 1247 (9th Cir. 2009).........................................4

*Zolg v. Kelly (In re Kelly)*, 841 F.2d 908 (9th Cir. 1988)................................ passim

## Statutes

11 U.S.C. § 101(8) ................................................................. 2, 9, 19, 23

11 U.S.C. § 109(e) .......................................................................................18

11 U.S.C. § 1201(a) .....................................................................................19

11 U.S.C. § 1301(a) ...................................................................................19
11 U.S.C. § 1322(b)(1)...............................................................................19
11 U.S.C. § 524(c)(6)(B) ...........................................................................19
11 U.S.C. § 707(a) .....................................................................................15
11 U.S.C. § 707(b) ............................................................................. passim
11 U.S.C. § 707(b)(1) ........................................................................... 19, 21
11 U.S.C. § 707(b)(2)............................................................................ 13, 21
11 U.S.C. § 707(b)(3)(A)............................................................................13
11 U.S.C. § 707(b)(3)(B) ............................................................................13

### Other Authorities

Robert M. Thompson, *Consumer Bankruptcy: Substantial Abuse and Section 707 of the Bankruptcy Code*, 55 Mo. L. Rev. 1 (1990) ...............................................17
Wayne R. Wells and Janell M. Kurtz, *A Critical Analysis of Bankruptcy Code Section 707(b)*, 36 Clev. St. L. Rev. 385 (1988)...............................................17
*Webster's Ninth New Collegiate Dictionary* (1984)................................19

### Rules

Federal Rule of Evidence 201 ....................................................................15

### Legislative Publications

H. Rep. No. 95-595, 95th Cong. 1st Sess. (1977)......................................20
Pub. L. No. 109-8, 119. Stat. 23 ................................................................21
Pub. L. No. 95-598, 92 Stat. 2549 .............................................................16
Pub. L. No. 98-353, 98 Stat. 333 .......................................................... 16, 17
Pub. L. No. 99-554, 100 Stat. 3101 ...........................................................17
S. Rep. No. 95-989 2d Sess. 22 (1978)......................................................20
U.S. Code Cong. Admin. News 1978 .........................................................20

**INTRODUCTION**

This is the third appeal taken by creditors from bankruptcy court decisions in the Chapter 7 case of Evander Kane ("Kane").[1] Underlying the first two appeals, a group of lenders similarly situated to Centennial Bank ("Centennial") brought a motion to convert Kane's case to Chapter 11 (the "Conversion Motion"), acknowledging that Kane's debts were "business debts" but asserting he should be forced into Chapter 11. *See* SER-009.[2] The bankruptcy court denied the Conversion Motion and two of the lenders appealed.

Centennial went a different way. It filed a motion to dismiss (the "Dismissal Motion"), arguing that Kane's Chapter 7 bankruptcy case should be dismissed because his debts were primarily consumer debts, and that allowing him to go through a Chapter 7 was an abuse of the Bankruptcy Code.[3] Centennial took a simplistic approach to its Dismissal Motion. It examined Kane prior to filing the

---

[1] Both South River Capital, LLC and Zions Bancorporation, N.A. appealed the bankruptcy court's order denying a motion to convert the case to Chapter 11. Their appeals are currently pending before this Court bearing case numbers 21-cv-3493-WHO and 21-cv-3765-WHO, respectively.

[2] "CB" citations are to Centennial's excerpts of record, ECF 10-1. "SER" citations are to Kane's concurrently filed supplemental excerpts of record**.**

[3] A court may dismiss a Chapter 7 case filed by an individual debtor whose debts are primarily consumer debts if it finds that the granting of relief would be an abuse of the provisions of Chapter 7. 11 U.S.C. § 707(b). This provision does not apply if the debts are non-consumer.

1

motion and asked if the large loans from the Lenders (defined below) were used to purchase properties, purchase or fund an operating business, or invest in business ventures. Because Kane answered in the negative, Centennial assumed the debts were primarily consumer and that allowing Kane to remain in Chapter 7 was a substantial abuse.

However, as discussed in Judge Johnson's decision, Centennial had misunderstood applicable bankruptcy law and failed to meet its burden on its Dismissal Motion. The vast majority of Kane's debts were non-consumer, which does not require a finding that the debt was business-related. Rather, this determination simply means the debts were not "consumer debts." *See* 11 U.S.C. § 101(8) (defining consumer debt to mean debt incurred by an individual primarily for a personal, family, or household purpose). The bankruptcy court properly interpreted the statute and case law and explained the distinction that Centennial's Dismissal Motion failed to grasp.

Kane respectfully urges this Court to affirm the decision of the bankruptcy court.

## JURISDICTIONAL STATEMENT

Kane agrees with Centennial regarding the basis for and appropriateness of this Court's jurisdiction over this appeal, and that the appeal was timely filed. Appellant's Opening Brief at 2–4.

2

## ISSUES PRESENTED AND STANDARDS OF REVIEW

### I.   Issues Presented

Centennial identifies four issues on appeal, which may be simplified as follows:

1. Did the bankruptcy court commit error when it denied Centennial's motion to dismiss Kane's Chapter 7 case under 11 U.S.C. § 707(b), when the court found that Centennial failed to meet its burden to establish that Kane's debts were primarily consumer debts?

2. Did the bankruptcy court hold Centennial to an improper burden of proof to establish the necessary elements of its Dismissal Motion?

Both questions should be answered in the negative. As set forth below, the bankruptcy court properly placed the burden on Centennial. Having found that Centennial failed to satisfy its burden, the bankruptcy court properly denied Centennial's Dismissal Motion.

### II.   Standard of Review

Centennial asserts that the bankruptcy court's legal conclusions are reviewed *de novo* and its factual findings are reviewed for clear error. *In re Price*, 353 F.3d 1135, 1138 (9th Cir. 2004); *Blausey v. United States Trustee*, 552 F.3d 1124, 1132 (9th Cir. 2009). Kane agrees with Centennial regarding the standard as to legal conclusions and factual findings.

3

Centennial also asserts that the bankruptcy court decided mixed questions of law and fact, and those determinations are reviewed *de novo*.[4] For this statement, Centennial relies on *United States v. Hinkson*, 585 F.3d. 1247, 1260 (9th Cir. 2009). Appellant's Brief at 4–5.

Centennial, however, ignores the Supreme Court ruling in *U.S. Bank N.A. v. The Village at Lakeridge, LLC*, 138 S. Ct. 960 (2018). In *Village at Lakeridge*, the Court held that the standard of review applied to mixed questions of law and fact depends on the specific type of mixed question at issue. *Id.* The issue presented in *Village at Lakeridge* was whether a particular creditor was a "non-statutory insider" pursuant to bankruptcy law. *Id.* The parties disputed whether the historical facts determined by the bankruptcy court satisfied the legal test chosen for conferring non-statutory insider status, *i.e.*, a mixed question of law and fact. *Id.* at 966.

> We here arrive at the so-called "mixed question" of law and fact at the heart of this case. . . . [T]he Bankruptcy Court below had found a set of basic facts about Rabkin; and it had adopted a legal test for non-statutory insider status . . . . As its last move, the court compared the one to the other—and determined that the facts found did not show the kind of preferential transaction necessary to turn a creditor into a non-

---

[4] Mixed questions of law and fact are "questions in which the historical facts are admitted or established, the rule of law is [resolved], and the issue is whether the facts satisfy the statutory standard." *Pullman-Standard, Div. of Pullman v. Swint*, 456 U.S. 273, 289 n.19, (1982).

statutory insider. For that decisive determination, what standard of review should apply?

*Id.* In answering that question, the Court noted that mixed questions are not all alike. *Id.* at 967. Some questions require courts to "expound on the law, particularly by amplifying or elaborating on a broad legal standard," which appellate courts should review *de novo*. *Id.* But others

> immerse courts in case-specific factual issues—compelling them to marshal and weigh evidence, make credibility judgments, and otherwise address what we have (emphatically if a tad redundantly) called multifarious, fleeting, special, narrow facts that utterly resist generalization.

*Id.* (internal marks removed). When that is so, "appellate courts should usually review a decision with deference." *Id.*

With these standards in mind, the Court in *Village at Lakeridge* focused on the mixed question presented: "Given all the basic facts found, was Rabkin's purchase of MBP's claim conducted as if the two were strangers to each other?" *Id.* at 968. "That," the Court noted, "is about as factual sounding as any mixed question gets." *Id.*

> The court takes a raft of case-specific historical facts, considers them as a whole, balances them one against another—all to make a determination that when two particular persons entered into a particular transaction, they were (or were not) acting like strangers. Just to describe that inquiry is to indicate where it (primarily) belongs: in the court that has presided over the presentation of evidence, that has heard all the witnesses, and that has both the closest and the deepest understanding of the record—*i.e.*, the bankruptcy court.

5

> . . . . And that means the issue is not of the kind that appellate courts should take over.

> . . . . A conclusion of that kind primarily rests with a bankruptcy court, subject only to review for clear error.

*Id.* at 968–69.

So too, here. The bankruptcy court considered a number of facts presented by way of declaration, examination testimony, documents and argument, to determine whether Kane's debts were primarily consumer or non-consumer. The inquiry was by definition fact specific. The bankruptcy court reached its conclusions based upon a number of case-specific facts and its conclusion should not be reversed absent clear error. *See also Aspen Skiing Co. v. Cherrett (In re Cherrett)*, 873 F.3d 1060, 1067 n.3 (9th Cir. 2017) ("the purpose of a debt is a factual finding reviewed for clear error").

The issues before this Court on appeal are either factual determinations or mixed questions. As such, the clear error standard applies to the review of the bankruptcy court's ruling. Under the clear-error standard, findings are reviewed "with a serious thumb on the scale" for the lower court. *Village at Lakeridge*, 138 S. Ct. 966. For a finding to be clearly erroneous, it must strike the appellate court as "wrong with the force of a five-week old, unrefrigerated dead fish." *Nagy v. Grp. Long Term Disability Plan for Emples. of Oracle Am., Inc.*, 739 F. App'x

366, 368 (9th Cir. 2018) (quoting *Ocean Garden, Inc. v. Marktrade Co.*, 953 F.2d

500, 502 (9th Cir. 1991)).

The bankruptcy court's findings are not clearly erroneous. To the contrary,

they are well-considered and supported by the available evidence (or lack of

evidence presented by Centennial, as the case may be). As such, the bankruptcy

court's order should be affirmed.

## STATEMENT OF THE CASE

### I.   Background and Events Prior to Kane's Bankruptcy

Kane is a 29-year-old professional hockey player who started playing

professionally at the age of 18. CB228. He is currently under contract with the San

Jose Sharks ("Sharks") and has played for the club since 2018. *Id.* At the time of

filing this bankruptcy, Kane lived in San Jose, California, with his wife and their

nine-month-old daughter. *Id.*

Through the "guidance" of an agent/broker, Sure Sports LLC ("Sure

Sports") and its principal Leon McKenzie, Kane entered into numerous loans.

CB229; SER-027. The loans were with Zions Bancorporation ("Zions") for $4.25

million, Centennial for $8 million, Professional Bank for $1.5 million, and South

River Capital ("South River") for $600,000. SER-027. Zions, Centennial,

Professional Bank, and South River are referred to collectively as the "Lenders."

7

The loans, which were complex financial transactions, were similar to one another. CB229; SER-027. The loans generally included a so-titled *Business Loan Agreement*, promissory notes, and related documents, such as garnishment waivers. *Id.* The Lenders all required that Kane sign additional documents, such as UCC-1 financing statements, to purportedly secure their loans against his future salary from the Sharks. *Id.* The loan documents did not include any of the customary consumer disclosures and protections. SER-027–28. Sure Sports arranged and underwrote the loans pursuant to an *Underwriting Fee Payment Agreement* that Kane entered into in August 2018. CB229. With respect to Centennial, Kane entered into several loan agreements as the amount of the loan was increased over time. *Id.* As of the petition date, the approximate debt to Centennial was $8,340,000. *Id.*

The idea that close to $15 million of loans arranged by a specialized underwriter/broker, all allegedly secured by complicated and legally questionable transaction documents, should be considered consumer debt, is simply not credible. Accordingly, in the Conversion Motion seeking to convert Kane's case to Chapter 11 filed by Zions and joined by South River and Professional Bank, the moving party acknowledged that the loans were for business purposes. SER-009.

Kane eventually defaulted on his loans with the Lenders and in October 2019 he retained John Fiero of Pachulski Stang Ziehl & Jones LLP to restructure

8

his debt. SER-028. Mr. Fiero brought in Ben Cary, a Certified Insolvency and Restructuring Advisor, to support the restructuring efforts. *Id.* Mr. Fiero concluded that the Lenders' assertion of a security interest in Kane's future salary was ineffective and contrary to the Uniform Commercial Code and so advised the Lenders. *Id.* Mr. Fiero spent many months and more than one hundred hours of attorney time seeking to reach a resolution with the Lenders. *Id.* The efforts were for naught, and the Lenders filed suits against Kane in state and federal court. *Id.* Faced with multi-front litigation, a cut in pay due to the COVID-19 pandemic, and far more debt than he could conceivably manage, Kane filed for Chapter 7 bankruptcy on January 9, 2021. *Id.*

## II.  Information about Kane's Debts

As the bankruptcy court's decision revolved around its analysis of the nature of Kane's debts, Kane provides the relevant background below. Kane and Centennial agree that in order for Kane's debts to be considered "primarily consumer debts" under 11 U.S.C. § 707(b), Centennial must establish that more than half of his debts are "consumer debts." *See* 11 U.S.C. § 101(8).

### A.  Secured Debts

Kane purchased the property known as 8447 Isabel Place, Vancouver, British Columbia, Canada (the "Isabel Property") in approximately 2011. CB228. He purchased this property as an investment and did not use it as a residence. *Id.*

As of the date of filing bankruptcy, the Isabel Property had secured debt against it of approximately $2,000,000 (USD) owed on a first deed of trust to Scotia Bank. *Id.* There is no dispute that this is a non-consumer debt.

Kane acquired another property in Vancouver located at 3457 West 35th Avenue (the "35th Avenue Property") in 2016 or 2017 as an investment. *Id.* Kane has not lived in this property, and it has been rented from time to time since it was acquired. *Id.* As of the petition date, the 35th Avenue Property had secured debt against it of approximately $2,439,000 (USD) owed on a first deed of trust to Scotia Bank. *Id.* There is no dispute that this is a non-consumer debt.

There is a second deed of trust secured against both the Isabel Property and the 35th Avenue Property. CB229. The amount of this debt is approximately $486,000 (USD). *Id.* Kane used the proceeds from this loan, along with some of his salary, to make the down payment on his San Jose home. *Id.* As the debt was used to purchase his family's residence, this is a consumer debt.

There is an additional secured debt owed to Lone Shark Holdings, LLC ("Lone Shark"). *Id.* This debt was incurred in relation to an investment in a tax conservation easement with Asher Capital, LLC. *Id.* The amount of this debt is $715,000 and is potentially secured against a tax refund. *Id.* As this debt was in fact related to an investment, there is no dispute that it is non-consumer debt.

10

### B.   Unsecured Debts

The debts to the Lenders are discussed above and are not repeated here. Kane paid Sure Sports hundreds of thousands of dollars in connection with the underwriting and arranging of these loans. *Id.* The vast majority of these loans were used to pay off existing lenders and proceeds were disbursed directly from escrow to the existing lenders, except for the proceeds from the South River loan. CB229–30. The South River loan proceeds of approximately $520,000 (after deducting almost $80,000 for origination fees, interest reserve, insurance, and legal fees) were deposited into Kane's bank account and used for various obligations. CB230. The bulk of the balance of the Lender's loans were paid directly from escrow to existing high-interest lenders. CB229.

In additional to the claims by the Lenders, other claims were filed in this case and are described briefly below:

     a.  Michigan Department of Revenue: $12,978 in tax debt.

     b.  Sure Sports: $1,187,950, which it alleges is due under the *Underwriting Fee Payment Agreement*.

     c.  Wells Fargo: $79,791 for a revolving credit account.

     d.  Raj Bhangu: $100,000 for a personal loan.

     e.  Pachulski Stang Ziehl & Jones LLP: $80,390 for attorneys' fees and costs incurred in attempting to assist Kane in restructuring his finances and defending litigation filed by the Lenders.

     f.   Lipsitz Green Scime Cambria LLP: $85,300 for attorneys' fees and costs incurred in litigation in New York and California.

     g.   Newport Sports Management, Inc.: $534,400 for fees incurred as Kane's sports agent.

     h.   Genovese Joblove & Batista, P.A.: $6,947 for attorneys' fees and costs incurred in the litigation with Sure Sports.

CB230. Other than the personal loan from Mr. Bhangu, the remainder of the debts from this list are non-consumer in nature. Some additional debts were listed on Kane's schedule of liabilities, but the designation of these debts as consumer or non-consumer is not material to the dispute.

## III.  Centennial's Dismissal Motion

Centennial's Dismissal Motion first argued that, despite what Kane stated in his bankruptcy schedules, his debts were primarily consumer debts. CB144–46; CB414. Centennial asserted that Kane has not been engaged in any business other than playing hockey professionally. It only discussed a small subset of Kane's debt, focusing on its claim that the loans extended by itself, Zions, and Professional Bank are "consumer" because the proceeds were not used to buy property or a business, fund an existing business, or purchase any sort of investment. *Id.* Centennial then concluded that, in its view, Kane's debts are consumer debts as a matter of law. *Id.*

12

Having convinced itself of the threshold issue that Kane's debts were consumer in nature, Centennial then asserted that Kane's Chapter 7 case should be dismissed (1) for failing the means test pursuant to 11 U.S.C. § 707(b)(2); (2) under the totality of the circumstances under to 11 U.S.C. § 707(b)(3)(B); and (3) for a bad faith filing pursuant to 11 U.S.C. § 707(b)(3)(A). CB146–155.

## IV.  Kane's Opposition to the Dismissal Motion

In opposition, Kane argued that Centennial's Dismissal Motion failed because it did not establish that his debts were primarily consumer debts. CB232–34; CB414. He listed each of his debts and analyzed their nature in sequence. *Id.* The Scotia Bank debts were non-consumer because the related real properties were purchased as investments and Kane never lived in them. *Id.* Furthermore, the "business" loans were non-consumer due to their cross-collateralization, sophistication, inclusion of a complicated security interest in Kane's future income,[5] and absence of standard consumer disclosures. *Id.* Furthermore, Kane argued that the loans were not incurred primarily for a personal, family, or household purpose. CB232–24; CB244–46.

---

[5] Kane disputed the validity and enforceability of the purported security interest in future income and asserted that these are unsecured liabilities.

13

Because Centennial failed to establish the threshold issue of Kane's debts being primarily "consumer" in nature, the subsequent issues of the means test, abuse, or bad faith were not reached. *See* 11 U.S.C. § 707(b). Nevertheless, Kane's opposition disputed these asserted grounds for dismissal. CB235–40.

## V.   Hearing on the Dismissal Motion

The bankruptcy court held a hearing on May 18, 2021. *See* CB349–83 (hearing transcript). The conduct of the hearing is discussed below.

## VI.   The Bankruptcy Court's Ruling

The bankruptcy court issued a thorough opinion (the "Order") denying the Dismissal Motion. CB412–26. The Order summarized its conclusion to deny the Dismissal Motion based on Centennial's failure "to provide evidence sufficient to meet its burden of showing that Debtor's debts are primarily consumer debts." CB412. The court noted Centennial's argument that because Kane confirmed that the Lender's loans were not used to buy property or a business, fund an existing business, or purchase an investment, those debts were consumer debt as a matter of law. CB414.

The court then summarized Kane's opposition and noted that Centennial filed a reply that "largely reiterates arguments already made in the motion." *Id.* As discussed in greater detail below, the bankruptcy court rejected Centennial's approach as inconsistent with the Bankruptcy Code, which focuses on consumer

14

debt and non-consumer debt, rather than consumer debt versus business debt.
Because the bankruptcy court ruled that Centennial failed to meet its burden on the
threshold issue of the nature of Kane's debt, it did not reach the additional issues of
the means test, abuse, or bad faith filing that it would have needed to decide to
grant the Dismissal Motion.

## SUMMARY OF THE ARGUMENT

A group of the Lenders filed or joined the Conversion Motion,
acknowledging that the Lender loans were business debt. The bankruptcy court
denied the Conversion Motion. Centennial tried a different tack, seeking to dismiss
Kane's case entirely on the basis that his debts were consumer debts, thereby
driving him out of bankruptcy back into the litigation-filled world he had filed
bankruptcy to resolve.[6] The bankruptcy court properly denied Centennial's
Dismissal Motion.

Kane's case is not a "consumer" bankruptcy case, and Kane is not a typical
consumer debtor for whom 11 U.S.C. § 707(b) was designed to impact. Centennial

---

[6] Subsequent to the bankruptcy court's Order denying its Dismissal Motion,
Centennial filed a second motion to dismiss under 11 U.S.C. § 707(a) alleging that
Kane's bankruptcy case was filed in bad faith. SER-047–195. The bankruptcy
court properly denied this motion as well, SER-196–213, which Centennial did not
appeal. While not critical to this appeal, the Court may take judicial notice
pursuant to Federal Rule of Evidence 201.

relied on a simplistic argument, evidencing a misapprehension of the Bankruptcy Code and relevant case law. It posited that if Kane's debts were not incurred to buy property or a business, fund an existing business, or purchase an investment, they were necessarily consumer in nature. In other words, if the debts were not incurred for "business," they must be consumer. As discussed at length in the Order, this binary analysis is inconsistent with the Bankruptcy Code. Because Centennial relied on this approach to prove its case, it failed to satisfy its burden and the bankruptcy court properly denied the motion.

In his discussion below, Kane provides background regarding 11 U.S.C. § 707(b) and then applies the statute to the facts of this case.

## ARGUMENT

### I.   Background Regarding Section 11 U.S.C. § 707(b)

The Bankruptcy Amendments and Federal Judgeship Act of 1984 (the "1984 Act")[7] added a number of provisions relating to consumer credit to the Bankruptcy Code as it was originally enacted by the Bankruptcy Reform Act of 1978 (the "1978 Act").[8] Following the passage of the 1978 Act, the consumer credit industry claimed the significant increase in bankruptcy filings caused a sharp increase in

---

[7] Pub. L. No. 98-353, 98 Stat. 333 (codified as amended in sections throughout Titles 11 and 28 of the United States Code).

[8] Pub. L. No. 95-598, 92 Stat. 2549.

losses from the discharge of consumer debts. *See* Wayne R. Wells and Janell M. Kurtz, *A Critical Analysis of Bankruptcy Code Section 707(b)*, 36 CLEV. ST. L. REV. 385, 385-88 (1988).[9] Among the concerns that prompted the enactment of the so-called "consumer credit amendments"[10] was the perception by the consumer credit industry that a large number of consumer debtors were discharging debt that they had the ability to repay. *See* Robert M. Thompson, *Consumer Bankruptcy: Substantial Abuse and Section 707 of the Bankruptcy Code*, 55 MO. L. REV. 1, 11 (1990).[11] One of the more significant changes included in the amendments was the addition of 11 U.S.C. § 707(b), which provided:

> After notice and a hearing, the court, on its own motion and not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor.[12]

---

[9] Available at https://engagedscholarship.csuohio.edu/clevstlrev/vol36/iss3/5.

[10] Subtitle A of Title III of Pub. L. No. 98-353 is entitled the "Consumer Credit Amendments."

[11] Available at https://scholarship.law.missouri.edu/mlr/vol55/iss1/7.

[12] 11 U.S.C. § 707(b) was later amended by the Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986, Pub. L. No. 99-554, title II, § 219(b), 100 Stat. 3101 (the "1986 Act"), to permit the United States Trustee to raise the issue of substantial abuse.

11 U.S.C. § 707(b) (Supp. II 1984). Thus, the 1984 Act allowed bankruptcy courts to dismiss Chapter 7 petitions filed by individual debtors whose debts were primarily consumer debts if it found them substantially abusive. The addition of 11 U.S.C. § 707(b) to the Bankruptcy Code curtailed the right of some consumer debtors to utilize Chapter 7 and forced them to elect Chapter 13 or forego the protection offered by bankruptcy altogether.[13]

The prerequisite to dismissal under 11 U.S.C. § 707(b) has always been a determination of whether a debtor's debts are primarily consumer debts. *See Zolg v. Kelly (In re Kelly)*, 841 F.2d 908, 912 (9th Cir. 1988) ("The first question we must address is whether some or all of the [debtor's] debts constitute 'consumer debts' within the meaning of the Code"); *In re Price*, 353 F.3d 1135, 1138 (9th Cir. 2004) ("The first prerequisite to dismissal under section 707(b) is that the debtor have primarily consumer debt"). If the court determines that the debt is primarily non-consumer in nature, then 11 U.S.C. § 707(b) does not apply. A court could not dismiss a Chapter 7 case for substantial abuse—or even reach the issue of abuse—if the debts that the debtor seeks to discharge are not "primarily consumer debts."

---

[13] Notably, Kane is ineligible to be a debtor under Chapter 13 pursuant to 11 U.S.C. § 109(e), which imposes debt limits of $419,275 for unsecured debts and $1,257,850 for secured debts.

To determine the jurisdictional scope of 11 U.S.C. § 707(b), courts have had to define the terms "primarily" and "consumer debts."

In *Kelly*, the Ninth Circuit turned to the dictionary definition of "primarily" to mean "for the most part." 841 F.2d at 913 (citing *Webster's Ninth New Collegiate Dictionary* 934 (1984)). Thus, "when 'the most part'—*i.e.*, more than half—of the dollar amount owed is consumer debt, the statutory threshold is passed." *Id*.

The statutory definition of "consumer debt" was introduced with the enactment of the 1978 Act. *See* 11 U.S.C. § 101(8) (originally codified as section 101(7) of the Bankruptcy Code and subsequently renumbered). "Consumer debt" is defined as "debt incurred by an individual primarily for a personal, family, or household purpose." *Id.* The term "consumer debt" in turn is used throughout the Bankruptcy Code. *See*, *e.g.*, 11 U.S.C. § 524(c)(6)(B) (excepting consumer debts secured by real estate from reaffirmation agreements); 11 U.S.C. § 707(b)(1) (providing for the dismissal of Chapter 7 cases filed by individual debtors whose debts are primarily consumer debts for abuse); 11 U.S.C. §§ 1201(a) and 1301(a) (staying actions against a co-debtor to collect consumer debt); 11 U.S.C. § 1322(b)(1) (exempting co-debtor consumer debt from the fairness requirement).

The legislative history of 11 U.S.C. § 101(8) indicates that the definition is adapted from the definition used in various consumer protection laws. *Bushkin v.*

19

*Singer (In re Bushkin)*, 2016 Bankr. LEXIS 2688, at *16 (B.A.P. 9th Cir. July 22, 2016) (citing *Stine v. Flynn (In re Stine)*, 254 B.R. 244, 249 (B.A.P. 9th Cir. 2000)); *see also* H. Rep. No. 95-595, 95th Cong. 1st Sess. (1977); S. Rep. No. 95-989 2d Sess. 22 (1978); U.S. Code Cong. Admin. News 1978, 5787, 5808.

In *In re Circle Five, Inc*., 75 B.R. 686, 688 (Bankr. D. Idaho 1987), the bankruptcy court connected the use of "consumer debt" in the Bankruptcy Code to the definition of consumer goods as set out in the Uniform Commercial Code with the critical factor being "the use of goods in the production of income, as opposed to normal consumptive activity by an individual." In *In re Almendinger*, 56 B.R. 97 (Bankr. N.D. Ohio 1985), the bankruptcy court observed the similarities between the definition of a "consumer" credit transaction under the Truth in Lending Act and the definition of "consumer debt" under the Bankruptcy Code. Cases decided under the Truth in Lending Act showed that when a transaction involves a profit motive, it is outside the definition of "consumer" credit. *See also Matter of Booth*, 858 F.2d 1051, 1054–55 (5th Cir. 1988) (citing cases and adopting the "profit motive" definition as the correct standard "in light of the plain meaning of the statute and its legislative history"); *Meyer v. Hill (In re Hill)*, 268 B.R. 548, 552–53 (B.A.P. 9th Cir. 2001) ("It is settled in this circuit that the purpose for which the debt was incurred affects whether it falls within the statutory definition of 'consumer debt'") (citing *Kelly*, 841 F.2d at 913, which states that "[d]ebt incurred

for business ventures or other profit-seeking activities is plainly not consumer debt for purposes of section 707(b)"). As the Ninth Circuit in *Kelly* recognized, a non-consumer debt may be incurred for business or other purposes with an eye toward profit. "Courts determine the debtor's purpose as of the time the debt was incurred." *Cherrett*, 873 F.3d at 1067.

Congress enacted the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA")[14] to further implement a means test to target individual debtors with above median income and consumer debt. *See generally* 11 U.S.C. §§ 707(b)(1) and 707(b)(2). The current version of 11 U.S.C. § 707(b)(1), in relevant part, provides:

> After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, trustee (or bankruptcy administrator, if any), or any party in interest, may dismiss a case filed by an individual debtor under this chapter *whose debts are primarily consumer debts*, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter.

11 U.S.C. § 707(b)(1) (emphasis added). Notwithstanding the amendments to 11 U.S.C. § 707(b), the threshold requirement for a motion to dismiss remains that a debtor must have primarily consumer debts.

With this background in mind, Kane now turns to the specifics of his case.

---

[14] Pub. L. No. 109-8, 119. Stat. 23.

21

## II.   The Bankruptcy Court Properly Denied the Dismissal Motion

### A.  Legal Standard on a Motion to Dismiss

A party moving for relief under 11 U.S.C. § 707(b) bears the burden of proof. *Harris v. United States Trustee (In re Harris)*, 279 B.R. 254, 259 (B.A.P. 9th Cir. 2002) (stating that the "moving party must establish (1) that the debtor owes primarily consumer debts; and (2) granting of Chapter 7 relief represents substantial abuse of that chapter."). "While dismissal for substantial abuse is discretionary, the determination of abuse must be based on factual findings supported by admissible evidence, and not by what amounts to inappropriate judicial notice of the court's own value judgments." *Id.; see also In re Cherrett*, 523 B.R. 660, 668 (B.A.P. 9th Cir. 2014), *aff'd*, 873 F.3d 1060 (9th Cir. 2017).

Centennial argues that Kane has the burden to how his debts are not consumer debts, relying on *In re Ferreira*, 549 B.R. 232, 237 (Bankr. E.D. Cal. 2016). Appellant's Opening Brief at 31–32. As noted by the bankruptcy court, *Ferreira* relied upon a bankruptcy court decision that was later reversed by the district court. CB419; *Palmer v. Laying*, 559 B.R. 746 (D. Colo. 2016). In reversing the bankruptcy court decision, the District Court remarked: "at most, the debtor's burden in this regard is one of persuasion. It still remains the UST's [United States Trustee] burden to show that the debtor's chapter 7 case should be dismissed, which, means that it remains the UST's burden to show that the debtor's

debts are primarily consumer debts." *Id.* at 756. Oddly, even though the bankruptcy court noted *Ferreira*'s reversal and the district court's language in its Order, Centennial still relies on the lower court decision in *Ferreira* without mentioning its reversal.

The Bankruptcy Code defines "consumer debt" as "debt incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(8). The purpose for which the debtor incurred the debt "affects whether it falls within the statutory definition of 'consumer debt'[;] debt incurred for business ventures or other profit-seeking activities does not qualify." *Hill*, 268 B.R. at 552–53 (citing *Kelly*, 841 F.2d at 913). "Courts determine the debtor's purpose as of the time the debt was incurred." *Cherrett*, 873 F.3d at 1067 (internal citation omitted). The Bankruptcy Code does not define non-consumer debt. Consumer debt is, however, distinguished from "non-consumer" debt with the latter being debt incurred with a "profit motive." *Citizens Nat'l Bank v. Burns (In re Burns),* 894 F.2d 361, 363 (10th Cir. 1990).[15] At least one court has found that the definition of

---

[15] The case law makes clear that a debt need not be incurred in a business transaction to fall outside the definition of consumer debt. *Hill*, 268 B.R. at 552–53.

consumer debt should be strictly construed. *In re Constantino*, 72 B.R. 189, 192 (Bankr. D.S.C. 1986).[16]

A helpful discussion of the "consumer debt" question is found in *In re Garcia*, 606 B.R. 98 (Bankr. D.N.M. 2019). This decision identified debts that were obviously consumer (*e.g.*, debts to buy a home, a divorce judgment) and those that were clearly non-consumer (*e.g.*, investment debts, credit card debts used for business). *Id.* at 105. The court then went on to describe debts that fell in a "gray area" which could not be easily placed in one of the two categories. The court noted that "while debts incurred with a profit motive clearly are not consumer debts, the reverse is not true: a debt that is not incurred with a profit motive may, or may not be, a consumer debt." *Id.* at 106 (citations omitted). Examples of non-consumer debts in the gray area included "involuntary debts like taxes" and debts incurred in connection with a tax write off or guarantees of business debts. *Id.* (citations omitted). The court then identified the main factor for consideration, the debtor's purpose in incurring a particular debt, which should be considered in the "totality of the circumstances" existing at the time the debt was incurred. *Id.* (citations omitted).

---

[16] The bankruptcy court determined that it need not follow this rule of construction as it was unnecessary to its decision. CB417.

24

Centennial seeks to distinguish *Garcia*, arguing that because the debtor's debts in *Garcia* were not in the "gray area" the case is inapplicable. It then argues that the bankruptcy court erred by adopting the *Garcia* analysis because it resulted in the court applying the incorrect legal rule. Appellant's Opening Brief at 23. The bankruptcy court's adoption of *Garcia* was appropriate, as it provided a useful guideline for analyzing Centennial's Dismissal Motion. The bankruptcy court's use of the *Garcia* framework did not result in the court ignoring Ninth Circuit precedent, as Centennial argues.

### B. *Centennial's Argument in its Dismissal Motion*

Turning now to specifics of Centennial's offering in support of its Dismissal Motion and its arguments at the hearing, the only evidence submitted by Centennial was the supporting declaration of Andrew W. Ghekas (the "Ghekas Declaration") which attached portions of a transcript of Kane's testimony at Centennial's examination.[17] CB165–205. The Ghekas Declaration then summarized the testimony as establishing that Kane did not use loan proceeds to "(a) purchase any property, (b) invest in any ongoing business, or (c) to start a new business venture." CB166–67. Centennial argued that this was sufficient to

---

[17] The examination was taken pursuant to Bankruptcy Rule 2004 upon application by Centennial

establish Kane's debts as consumer. Other than a brief discussion of the debt to
Lone Shark, admitting that its $715,000 claim was non-consumer, Centennial
failed to discuss any of Kane's other debts. *See* CB154. Centennial also claimed
Kane had no investments. CB145. However, Kane's real properties located in
Vancouver, British Columbia, are investment properties, and the majority of debt
secured against the properties are not consumer debt.[18] CB244.

> At the hearing on the Dismissal Motion, Centennial's counsel argued:

> the purpose of these loans was to pay off other loans that Kane owed.
> So the debt was used for a personal use. It was to get Mr. Kane out of a
> sticky financial situation where personal loans that he'd taken out
> previously that had high interest rates. His testimony confirmed that he
> didn't use any of the loan proceeds from Centennial Bank, Zions Bank,
> Professional Bank to invest in any business venture, to purchase any
> investment property, or to operate any business.

CB355–56. As the bankruptcy court noted, however, in describing Centennial's
argument:

> the moving party seems to say that Mr. Kane's debts are consumer debts
> because he is not engaged in a business, that there's this sort of divide
> that's created. It's either consumer debt or it's a business debt and I
> guess the question that I have is, is that the standard? Because the Code
> only defines consumer debt. It doesn't define anything else that might
> be out there that is, if you will, not consumer debt, so in some senses, I
> think the distinction is consumer debt versus not consumer debt.

---

[18] As noted by Kane in his own declaration, the second deed on the
Vancouver properties was for money borrowed to purchase his family's home in
San Jose, and as such would be consumer debt. CB244.

CB368. After some colloquy between the court and Centennial's counsel, the court

again noted the shortcomings in Centennial's approach:

> Well, let me clarify that because if I'm remembering right, the questions
> that you asked were, did you invest this in a business? Did you invest
> this in an activity? But that's not exactly the right question for Mr. Kane
> in terms of his deposition, right? I mean those questions are toward, is
> this a business? And that's not the inquiry.

* * *

> . . . I think, you've pigeon[]-holed things into, is it consumer or is it
> business? If it's not business, then it must be consumer, which is the
> way your brief reads.

CB369–70. Finally, Centennial argued, as it does in its current brief, that because

Kane could not recall during an examination what the previous loans were used for

(*i.e.*, the loans that were paid off by the Lenders' loans), that the burden shifts to

Kane and alleviated Centennial's failure to prove its case. The bankruptcy court

rejected this reasoning at the hearing, inquiring:

> Well, does your—I mean, your client must have underwritten this loan
> at some point. Does your client know what this money was going to be
> used to pay off?

* * *

> . . . I understand from your brief and the filings that [Kane] didn't have
> a real good grasp of where this money went. But you're saying, too,
> that you sitting here today, you don't have a real good grasp of where
> it went, or from your client's records either, or what the original
> purpose of these loans were?

CB373–74. Centennial's counsel responded, ". . . Your Honor, that is correct."

CB374.

The bankruptcy court prodded Centennial with additional questions and hypotheticals to explore the distinction between consumer and non-consumer debts. CB375–79. Centennial stood by its binary approach that, unless the debt was for investment or business, it must be a consumer debt; and unless Kane could prove otherwise, the Lenders were entitled to consider their loans (totaling some $15 million) to be consumer debt despite: (1) the loan documents were often titled as "Business Loan Agreements," *see, e.g.,* CB249; (2) the loans were purportedly secured by complicated financial transactions, *see, e.g.,* CB259–69; (3) the loans were highly sophisticated and arranged by a well-compensated loan broker, CB229; (4) the loan documents lacked standard consumer disclosures, *see* CB249–319; and (5) Kane did not incur the loans at issue primarily for a personal, family, or household purpose, CB232–24; CB244–46.

Centennial submitted scant evidence regarding the nature of Kane's debts, certainly far less than required to meet its burden of proof, and the Dismissal Motion was properly denied.

### C. The Bankruptcy Court's Ruling

As described above, the court held that Centennial failed to satisfy its burden to show that Kane's debts are primarily consumer debts. CB425. When it turned to some of the specific debts, the bankruptcy court held that Centennial's debt of approximately $8.4 million was not consumer debt. CB420–21. The court focused

28

on the following factors: (1) the proceeds from Centennial's loan were used to pay off existing loans; (2) the Centennial loan was used to pay off higher interest loans, thereby effecting "a transaction that increased his economic value, which further shows that this debt was not incurred for a consumer purpose"; (3) there was no personal consumption as the transaction was purely financial; (4) Centennial had an opportunity to obtain information as to the underlying debt it paid at the time it made the loan or since Kane's bankruptcy filing, but failed to do so; and (5) Centennial only presented evidence of whether the debt was business or investment debt, which evidence did not answer the matter in question. CB420–21.

The bankruptcy court then held that the other similarly situated loans were also not consumer debt. CB422–24. The court began with the fact that the Zions and South River documents characterized the loans as business loans, and South River's documents specified that the proceeds would be used for "[b]usiness related expenses." CB422. The court also noted the complexity of the transactions. CB422–24. The loan documents purported to create a security interest in Kane's future salary and required he maintain "Death & Disgrace Insurance" to insure repayment in the event of either. CB 422–23. The loan documents, with one minor exception did not contain "customary disclosures" one would anticipate finding in consumer transactions. CB422. The loans also required direct payment from the Sharks to the lender and required Kane to maintain professional management. *Id.*

Given the above, and the absence of any evidence from Centennial, the bankruptcy court could infer the intent from the documents themselves. CB423–34.

The bankruptcy court then looked to the connection between the loan documents and Kane's employment and analogized the situation to the one in *Cherrett* in which the offering of the loans was done only in connection with Kane's future employment—to wit, being a professional hockey player. CB423; 873 F.3d 1060.

The bankruptcy court next turned to the debts over which there was no genuine dispute as being non-consumer: (1) the Lone Shark debt, which was borrowed for an investment; and (2) the Scotia Bank debts, which were borrowed to purchase Canadian real estate. CB424–25. The court's calculations indicated that out of a total debt of approximately $28 million, about $20 million was non-consumer.[19] CB425. As such, it was not a close call and court determined that Centennial failed to establish the threshold element of Kane's debts being primarily was consumer debts.

---

[19] The precise sums were a total debt of $28,191,340 and a non-consumer debt total of $19,776,266.66. CB425. The bankruptcy court did not discuss other unsecured debts which were clearly non-consumer and about which there was no dispute: Michigan Department of Revenue ($12,978); Sure Sports ($1,187,950); Pachulski Stang Ziehl & Jones LLP ($80,390); Lipsitz Green Scime Cambria LLP ($85,300); Newport Sports Management, Inc. ($534,400); and Genovese Joblove & Batista, P.A. ($6,947). *See* CB230.

*D. Centennial's Argument on Appeal*

Centennial repeats the same failed argument on appeal that it made in the bankruptcy court. Centennial still fails to understand the distinction between consumer and non-consumer debt. It argues that Kane incurred a "substantial amount" of his debt to "pay off pre-existing personal debt obligations," which it argues "[c]onstitutes quintessential-consumer debt." Appellant's Opening Brief at 13. One wonders how an individual would have anything but "personal debt obligations," as if this description is meaningful in the analysis of the consumer or non-consumer nature of a debt.

Centennial also argues that debts that are incurred voluntarily are necessarily consumer debts. Appellant's Opening Brief at 16–19. This is a new argument made for the first time on appeal, which Centennial has waived by failing to address any of the narrow exceptions to the general rule that an argument raised for the first time on appeal is waived. *United States v. Carlson*, 900 F.2d 1346, 1349 (9th Cir. 1990); *El Paso v. Am. W. Airlines, Inc. (In re Am. W. Airlines, Inc.)*, 217 F.3d 1161, 1165 (9th Cir. 2000). Even if this new argument was considered, it should be rejected because there is no general rule that voluntarily incurred debts are consumer debts. In fact, the "distinction" is meaningless.

Centennial quotes a First Circuit B.A.P. decision for the premise that "a consumer debt is one that is 'incurred'—implying that some voluntary action is

31

taken before a consumer becomes liable on the debt," and the counter-premise that only unintentionally incurred debt is non-consumer debt. *Conde-Vidal v. Pinto-Lugo (In re Velez)*, 617 B.R. 158, 170 (B.A.P. 1st Cir. 2020); *see In re Kersten*, No. 17-13739-7, 2018 Bankr. LEXIS 1546, at *4–5, 2018 WL 2413829 (Bankr. W.D. Wis. May 25, 2018).

While the voluntary or involuntary nature of a debt can be a factor guiding the determination of whether it was consumer or non-consumer, it is not solely determinative. *See Cherrett*, 523 B.R. at 668 (the fundamental question in determining whether a debt constitutes a "consumer debt" is whether it was "incurred by an individual primarily for a personal, family, or household purpose"). Courts have determined that tax liabilities and tort judgments are non-consumer because even though the action leading to the liability was intentional, the debtor did not intentionally incur the debt or judgment.[20] *Kersten*, 2018 LEXIS 1546 at *3. However, it does not follow that all voluntarily incurred debt must be consumer debt. An action taken with a profit motive is necessarily one that is taken voluntarily, and one can easily imagine business debts that are incurred voluntarily (for example, taking a loan to purchase inventory, or to restructure business debts

---

[20] Some decisions classify these as neither consumer nor business debts, and label them "interstitial" debts. *See, e.g., In re Velez*, 617 B.R. at 172; *In re Damond*, 586 B.R. 212, 220 (Bankr. D. Md. 2018).

as to obtain favorable terms).[21] Accordingly, Centennial's argument that voluntarily incurred debts are unavoidably consumer debts is mistaken.

## CONCLUSION

Kane requests that this Court affirm the bankruptcy court's denial of Centennial's motion to dismiss Kane's Chapter 7 case. Centennial clearly failed to meet its burden on the motion and chose instead to rely on an overly simplistic and incorrect analysis of what constitutes "consumer debt." The bankruptcy court made a factual determination that the overwhelming bulk of Kane's debt was non-consumer, which decision should be affirmed.

Date: September 7, 2021

FINESTONE HAYES LLP

*s/Stephen D. Finestone*
Stephen D. Finestone
Ryan A. Witthans

*Attorneys for Appellee,*
EVANDER FRANK KANE

---

[21] Again, and as the bankruptcy court's decision pointed out, the issue is not consumer versus business, but consumer versus non-consumer. Centennial incorrectly portrays the consumer/business characterization as having only two sides. To the contrary, "an inability to classify a particular debt as a business debt does not automatically relegate it to the status of a consumer debt." *In re Velez*, 617 B.R. at 170.

# CERTIFICATION OF COMPLIANCE FOR BRIEFS

**No.:**          3:21-cv-03765-WHO

**Debtor:**    Evander Frank Kane

The undersigned certifies that this brief contains 7697 words, excluding the items exempted by Federal Rule of Bankruptcy Procedure 8015(g). This brief complies with the word limit of Federal Rule of Bankruptcy Procedure 8015(a)(7)(B)(i). The type size and typeface comply with Federal Rule of Bankruptcy Procedure 8015(a)(5)(A).

Date: September 7, 2021                    FINESTONE HAYES LLP

*s/Stephen D. Finestone*
Stephen D. Finestone
Ryan A. Witthans

*Attorneys for Appellee,*
EVANDER FRANK KANE

34